WELSCH v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1915.)

No. 1296.

1. PROSTITUTION ⚌4—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES—
SUFFICIENCY OF EVIDENCE.

On a trial for persuading and enticing a girl, with whom accused
sustained immoral relations, to return from Ohio, where she was visiting,
to her home in West Virginia, for purposes specified in the White Slave
Traffic Act (Act June 25, 1910, c. 395, 36 Stat. 824 [Comp. St. 1913, §§
8812–8819]), evidence *held* insufficient to show any persuasion by accused,
but, on the contrary, to show that she returned home at the request of
her aunt, transmitted through accused as a mere messenger.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 4; Dec.
Dig. ⚌4.

Violations of White Slave Act, see note to Savage v. United States,
130 C. C. A. 2.]

2. PROSTITUTION ⚌1—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES—
OFFENSES.

That accused in communicating to a girl, with whom he sustained
immoral relations, her aunt's request that she return home, had in mind
the probability or expectation of again possessing her on her return home,
did not make him guilty of a violation of the White Slave Traffic Act,
where her return was not brought about or influenced by his persuasion.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. §§ 1, 2; Dec.
Dig. ⚌1.]

3. PROSTITUTION ⚌4—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES—
SUFFICIENCY OF EVIDENCE.

On a trial for violating the White Slave Traffic Act, evidence *held* to
show that when accused communicated to a girl, with whom he sustained
immoral relations, her aunt's request that she return home, he had no par-
ticular intention respecting the resumption of their relations, and could
not have anticipated an act of sexual intercourse, which occurred a few
days after her return home.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 4; Dec.
Dig. ⚌4.]

4. PROSTITUTION ⚌5—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES
—INSTRUCTIONS.

On a trial for persuading and enticing a girl, with whom accused sus-
tained immoral relations, to go from one state to her home in another
state for immoral purposes, an instruction that if accused furnished the
transportation to the girl solely at the instance of the girl's aunt, because
she wanted her to return home, and if he was simply a messenger to con-
vey that and furnish the transportation, and had no other or further
intent, he should be found not guilty, but that, if he had the further
purpose and intent after she was transported to her home to renew
sexual intercourse with her, he should be found guilty, was misleading,
if not erroneous, as the jury might have *understood* therefrom that ac-
cused was guilty, however free his words and acts from persuasion or
inducement, if he had the secret intention of profiting unlawfully by the
girl's return home, especially as the verdict acquitting accused of the
charges of transporting and aiding in transporting the girl, and convict-
ing him of unlawful persuasion, was inconsistent and indicated that the
jury were confused as to the law.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 5; Dec.
Dig. ⚌5.]

In Error to the District Court of the United States for the Northern District of West Virginia, at Wheeling; Alston G. Dayton, Judge.

W. A. Welsch was convicted of an offense, and he brings error. Reversed and remanded.

S. O. Boyce and J. B. Handlan, both of Wheeling, W. Va., for plaintiff in error.

J. J. P. O'Brien, Asst. U. S. Atty., of Wheeling, W. Va. (Stuart W. Walker, U. S. Atty., of Martinsburg, W. Va., on the brief), for the United States.

Before KNAPP and WOODS, Circuit Judges, and WADDILL, District Judge.

KNAPP, Circuit Judge. The plaintiff in error (defendant below and herein so called) was indicted in October, 1913, for a violation of the White Slave Traffic Act. The indictment contains three counts, charging the defendant (1) with unlawfully transporting in interstate commerce, for the purposes named in the statute, and aiding in such transportation, a woman under the age of 18 years; (2) with unlawfully procuring, and aiding in procuring, a railroad ticket to be used for the transportation described in the first count; and (3) with unlawfully persuading and enticing the woman in question to go in interstate commerce from and to the places and for the purposes stated in the preceding counts.

At the trial in May, 1914, the defendant was found guilty as charged in the third count of the indictment, and not guilty on the other two counts; and the sentence thereupon imposed was imprisonment for three years in the penitentiary of West Virginia.

The principal question presented by the assignments of error is whether the evidence sustains the verdict of conviction. To appreciate this question, it is necessary to state with care and somewhat in detail the material facts to which the witnesses testified.

[1] The defendant is a locomotive engineer, unmarried, and about 35 years of age. For two or three years prior to July, 1912, he lived at McMechen, W. Va., making his home with a married brother, George Welsch, and his wife. Three doors away on the same street was the house of another brother, Michael H. Welsch, and his wife. Two other brothers, Martin E. Welsch and Charles Welsch, also lived in McMechen, apparently in the same neighborhood. Some time before the date mentioned, Michael Welsch and his wife, who were childless, had taken into their home two nieces, Mary L. Forbes and Bernice Forbes, whom they provided for and treated as their own children. Mary was about 14 when she went to live with this uncle and aunt; Bernice a few years younger. The mother of these girls, a sister of Mrs. Welsch, was dead, and their father, J. E. Forbes, who was a cousin of Mr. Welsch, appears to have lived part of the time at McMechen and part of the time at Barnesville, Ohio. At or near the latter place was the residence of J. T. Forbes, a brother of J. E. Forbes, and his wife, and likewise of their father, the grandfather of Mary and Bernice. At Barnesville also lived James P. Welsch, another brother of the defendant, and two brothers of Mrs. Welsch by

the name of Jackson. The defendant was on familiar terms with all his relatives, especially those living at McMechen, and visited the house of Michael Welsch almost daily.

Although he repeatedly and stoutly denied it, we must assume, under the verdict of the jury, that the defendant seduced Mary Forbes some time in the summer of 1910, when she was between 15 and 16 years of age. After this, according to her testimony, they cohabited nearly every day for some months, and frequently afterwards. On the 8th of July, 1912, after her school closed, Mary Forbes went to Barnesville to spend the vacation with her uncle and aunt, Mr. and Mrs. J. T. Forbes, expecting to stay with them until school opened again about the 1st of September. She traveled there on a pass issued the 20th of May, and was accompanied by her grandfather and a young lady and by the defendant. After their arrival in Barnesville, and on the evening of that day, she testifies that he had connection with her. Instead of remaining in Barnesville until September, she returned to McMechen on the morning of the 31st of July, under circumstances which will presently be related.

It appears that her uncle, Michael Welsch, had gone a few days before to Wilmington, Del., to attend the funeral of a relative. He had been suffering for some time from a serious ailment of the face or jaw, and on that account stopped in Baltimore on his return to consult a physician. He was advised that a surgical operation was necessary and accordingly went to a hospital for that purpose. He sent a postal card to inform his wife of this situation, and she made preparations at once to go to Baltimore and take with her Bernice and the defendant. This was on the 30th of July. As she wanted some one to care for the house during her absence, she requested the defendant, who was going to Barnesville that afternoon, to notify their relatives of the coming operation and also to attend some meeting or banquet of a fraternal organization, to ask Mary to return home, and, as she knew her pass had expired, gave him a dollar to give to her to pay her fare back on the cars. She did in fact return to McMechen the following morning, reaching the house just as her aunt and sister and the defendant were leaving for the train to Baltimore. They reached Baltimore some time after midnight, and learned either then or the next morning that the operation upon Mr. Welsch had already been performed and was successful. Thereupon, according to the testimony, the defendant went back that night to McMechen for the purpose of sending some money to his brother to pay his hospital bill and other expenses. He arrived in McMechen early the next morning, the 2d of August, and sent a money order for $100 about noon of that day.

When Mary Forbes got home Wednesday morning, as above stated, there was some conversation in front of the house where she met her aunt and the others as they were leaving. She said in substance that although she had come home she had promised to go back to Barnesville for a picnic which was to take place on Saturday. Her aunt thereupon told her that she could go back that afternoon or remain until Saturday and return with some of the relatives who were going to the same picnic. She was also told that another pass had come for her which was on

the mantel in the house, and two or three of the persons there present testified that she went in and got it. Apparently her aunt had been uncertain whether she would come back as requested, and so had made other arrangements for having her house looked after. Some time that day, whether at once or later does not appear, Mary went to Martin Welsch's, where she stayed that night and also Thursday and Friday nights. The testimony describes the arrangement of the rooms in the house where Martin Welsch and his wife lived, and the room where Mary slept with a young girl, Agnes Schuyler, who was there visiting.

Again it must be assumed, under the verdict of the jury, however improbable her story of what occurred on Friday morning, especially in view of the testimony of Mrs. Martin Welsch and Agnes Schuyler, that the defendant, upon reaching McMechen early that morning, went almost at once to Martin Welsch's house, entered it through the kitchen, aroused Mary from sleep, and induced her with some difficulty to go over to Michael Welsch's house, where they had sexual intercourse.

On Saturday morning she went to Barnesville by train; the defendant and several others going with her. She remained there then until about the 1st of September, when she came back to McMechen and entered upon her last year at school. In May, 1913, she graduated from the high school, and then remained at McMechen until about the 1st of August, when she went to Barnesville, and there on the 19th of that month gave birth to an illegitimate child, of which she avers the defendant is the father. She says that during this year also the defendant had frequent intercourse with her. In this connection it may be noted that the testimony is positive and wholly uncontradicted that, up to a short time before she became a mother, none of the relatives had the slightest suspicion of anything improper between her and the defendant.

With this general outline of facts which were undisputed, or presumably found by the jury, we come to a more particular account of what occurred in connection with the return of Mary Forbes on the 31st of July, 1912, from Barnesville to McMechen. Bearing in mind that the defendant was acquitted of the charge of transporting her back to her home, or aiding in such transportation, and also acquitted of the charge of procuring a railroad ticket, or aiding in procuring the same, to be used by her in returning to McMechen, it remains to consider whether there was any evidence which warranted the jury in finding the defendant guilty of that persuasion and inducement which the act denounces and of which he was convicted. We do not see how anything more can be claimed by the government in this regard than the testimony of the girl herself. After telling of her seduction by the defendant two years before, of the illicit relations which thereafter continued between them, of the circumstances connected with her trip to Barnesville on the 8th of July, and the intercourse there on the evening of that date, she speaks of the occasion of his visit to her on the 30th of that month, and this is what she says, and all she says, regarding what took place at that time:

"Q. You say he came to see you there on the 30th? A. Yes, sir. Q. How long did he remain at that time? A. Well he drove down in a buggy, and he asked me to take a drive with him, and we drove down to Bailey's Mills; I don't know just how far it is below there. Q. Did he have intercourse with you at that time? A. No, sir. Q. Then you say you went back to McMechen from Barnesville the next day, the 31st? A. Yes, sir. Q. In what state is Barnesville? A. In Ohio. Q. Please tell the jury why you went back to McMechen. A. Mr. Welsch come out there in the buggy, and he asked me to take a drive with him, and I went with him, and he told me that my uncle was in the hospital in Baltimore, and my aunt wanted me to come down home. Q. You mean come back to McMechen? A. Yes, sir. Q. State whether or not he furnished you any means of transportation to go back to Mc-Mechen? A. I told him I had nothing to come back to McMechen on, and he said he would give me money, and he gave me a dollar. Q. What kind of a dollar? A. A silver dollar. Q. Did anybody else see him give you that dollar? A. No, sir; nobody saw him give it to me. Q. Did anybody see you have that dollar? A. Yes, sir; my aunt, Mrs. J. T. Forbes. Q. Then you went back to McMechen on the 31st day of July? A. Yes, sir."

It will be observed that she does not here say that she told him whether or not she would go home as her aunt had requested. However, on her redirect examination, after the cross-examination was concluded, the following question and answer are shown by the record:

"Q. Did you tell him what day you would come from Barnesville to Mc-Mechen after he gave you the dollar? A. If I remember right, I believe I told him if I could I would be down in the morning on the 8 o'clock train."

This covers everything testified to by her as to what was said or done by the defendant, or by herself, on that 30th of July, relative to her going home the following day, and no other witness gives a word of material evidence upon that subject. She does not say that he asked or advised her to return, or even intimated a desire that she should do so. Her own version of the occurrence excludes the idea of any wish or hope expressed by him that she would comply with her aunt's request, but represents him as simply communicating that request to her, and giving her the dollar which her aunt had sent by him to pay her fare back to McMechen. Nor were any circumstances shown in connection with his visit to Barnesville that afternoon which permit an inference, not justified by her own testimony, that he made the slightest effort to have her do what her aunt requested. For aught that appears, either directly or indirectly, his attitude in the matter was one of indifference. It is only repeating to say that according to her own testimony he attempted in no manner to influence her one way or the other.

Taking into account everything disclosed which bears upon her going back to McMechen, and her reason for returning, it is impossible for us to discover, in the words or conduct of defendant, anything resembling that persuasion and inducement which the act seems clearly to contemplate, and which appears to us as essential to constitute a violation of the provision in question. The only reasonable deduction from the proofs is that the girl went home simply and solely because she felt that under the circumstances she ought to go there. The fact that the message from her aunt was brought to her by the man who had seduced her, and with whom she had immoral relations during the previous two years, cannot be said to have at all caused her

return, because it does not seem open to doubt that she would have gone home just the same if the information and request upon which she acted had come to her through another channel. In short, there was no perceptible relation of cause and effect between her return and the defendant's misconduct with her, whether before or after that event.

[2] In our judgment, it will not do to say, upon the facts here considered, and about which there is no dispute, that the act in question was violated because it may have occurred to him, or he may have had in mind, the probability or expectation of possessing her again in Mc-Mechen, unless her return to that place was brought about or influenced by his persuasion. To justify his conviction we think it was necessary to show that except for his expressed desire and inducement, she would not have made the journey. It appears to us an untenable proposition, when this girl went back home for a legitimate and commendable reason, because of information coming to her which was of itself ample cause and explanation of her return, that the defendant can be held to have committed the offense of which he was found guilty merely because he might have had the secret desire or intention of using her there for the gratification of his passion, although he had nothing whatever to do with her going back which was not entirely suitable and proper.

[3] Moreover, it seems to us that the evidence negatives the idea that the defendant on the 30th of July, when he had the interview with Mary in Barnesville, had any particular intention respecting the resumption of their relations, or could then have anticipated any such occurrence as she testifies took place in her uncle's house on the morning of the 2d of August. The proof shows that arrangements were made on the 30th of July by Mrs. Welsch to go to Baltimore the next day and take Bernice and the defendant with her. It appears to have been the expectation of all of them that they would be detained in Baltimore a week or more, for they supposed then that Mr. Welsch was to be operated on the following day, Thursday, and did not know until they got to Baltimore that the operation had already been performed. Not only is this the uncontradicted testimony of the persons mentioned and others, but related circumstances were shown which give to their statements in this regard all the appearance of essential truthfulness. It is certainly reasonable to believe that the defendant fully expected when he left McMechen to stay in Baltimore for some days at least, and nothing was shown to indicate any understanding between him and Mary that he would come back so much sooner than he apparently intended. Her own version of what took place on the following Friday morning is quite inconsistent with the idea that she looked for his return at that time or for several days thereafter. Undoubtedly the gist of the alleged offense is the intention which underlies words and acts and gives them significance, but we think the strong preponderance of the evidence, even if it can be said there was anything to support a contrary inference, was against the notion that the defendant had any definite intention concerning intercourse with the girl which was connected with her return from Barnesville on the 31st of July.

220 F.—49

[4] In its bearing upon the question here discussed, we are of opinion that the following instruction to the jury was misleading if not erroneous:

"The gist of the whole offense turns upon the intent of the party. At the same time, I feel compelled to instruct you that a person may have one or more intents and purposes in view when he does an act. One of them may be perfectly legitimate and perfectly lawful. At the same time he may have a further intent—that, from the circumstances growing out of the transaction, ultimately he may have an unlawful intent. For example, I instruct and charge you that if this defendant, Welsch, furnished the transportation to this girl to go from Barnesville to McMechen at the instance and solely at the instance of Mrs. Michael Welsch, because of the fact that her husband was to be operated on in Baltimore, and she wanted her to return there to McMechen, if he was simply the messenger to convey that and furnish the transportation, and had no other or further intent, then it is your clear duty to find this defendant not guilty; but if, at the same time that he had that purpose and intent, he had the further purpose and intent, after she was transported from Barnesville to McMechen, to renew sexual intercourse with her, if he had had it before, then it is your duty to find him guilty under this statute."

Even if it be granted that this is not incorrect as an abstract proposition, we are nevertheless convinced that its application to the facts and circumstances of this case was liable to give and probably did give the jury a misleading impression, in that it left them at liberty to find the defendant guilty, indeed made it their duty to find him guilty, if they believed that he had the secret intention of profiting unlawfully by the girl's return, although nothing whatever was said or done by him to persuade or influence her to do so. In other words, the jury were told in effect that his communication to her of her aunt's request and giving her the money furnished to pay car fare, however suitably and properly he may have performed his errand, and however free his words and acts from any persuasion or inducement, should not be permitted to save him from conviction if they believed that he then had in mind that her return would enable him at some indefinite time thereafter to avail himself of opportunities for further sexual intercourse with her. We think this gave the jury unwarranted latitude and involved a construction of the statute which carries it quite beyond its intended scope. And this view of the import of the instruction quoted is confirmed, in our opinion, by the inconsistent verdict which the jury rendered. Of course the fact that a verdict is altogether illogical is not of itself a reason for setting it aside, but the action of the jury in this instance, in acquitting the defendant of the charge of transporting the girl or in any way aiding in her transportation, while convicting him of the separate charge of unlawful persuasion, indicates to us that the minds of the jury were confused and given an erroneous impression of the law and their duty by the instruction in question. If we are right in our conception of this statute, that the prohibited offense was not committed unless the girl's return home was in some way brought about or influenced by the defendant's wrongful intent, unless, in other words, she would not have returned except for such intent, it follows that the jury should have been so instructed, and that the instruction actually given was misleading and prejudicial.

In further support of this conclusion it may be pointed out that the

instruction here considered, as it appears to have been understood and followed by the jury, gives to the statute a scope and meaning which has not been indicated or foreshadowed in any previous decision. We have endeavored to examine with care every reported case under this act, but are unable to find any ruling or intimation which sustains this verdict of conviction. In all those cases there was not only clear evidence of persuasion and enticement, but in every instance the destination of the person enticed was a place and environment which implied a purpose to engage in immoral practices. Thus, in the Athanasaw Case, 227 U. S. 326, 33 Sup. Ct. 285, 57 L. Ed. 528, Ann. Cas. 1913E, 911, the destination was a low-class theater, where the surroundings and associations were such as to furnish potent and almost irresistible temptation to a life of dishonor; in the Wilson Case, 232 U. S. 563, 34 Sup. Ct. 347, 58 L. Ed. 728, the destination was a notorious house of ill fame. In the case at bar there is nothing but speculation and conjecture upon which to rest a finding of that persuasion which the act denounces, while the interstate journey was to the girl's own home, a home of unquestioned respectability, in which she had lived for years and in which she continued to live for nearly or quite a year afterwards, with all the outward appearance of innocence and virtue.

It goes without saying that this statute should receive a construction which will make it efficient to accomplish its intended purpose, but it should not be so enlarged or extended by judicial interpretation as to take in transactions which, however reprehensible, cannot be reasonably regarded as within its aim and intent. The conduct of this defendant, which the verdict requires us to assume, in corrupting a school girl of 15, closely related to himself by blood and a member of his brother's family, was so treacherous and detestable as to class him with the meanest of criminals; but that gives no warrant for punishing him under the White Slave Traffic Act, unless his proven transgressions come fairly within its provisions.

In our opinion it has not been shown, and there was no evidence which would justify the jury in finding, that this unfortunate girl traveled from Barnesville to McMechen on the occasion in question because of any inducement of persuasion by the defendant, or because her return home was brought about by his unlawful intent and purpose respecting her; and we are therefore constrained to hold that the judgment of conviction must be reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed.