## HANSEN v. HAFF, ACTING COMMISSIONER OF IMMIGRATION.

No. 325. Argued February 6, 1934.—Decided March 5, 1934.

*Mr. Roger O'Donnell,* with whom *Mr. Stephen M. White* was on the brief, for petitioner.

*Assistant Attorney General Sweeney,* with whom *Solicitor General Biggs* and *Mr. Harry S. Ridgely* were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

By § 3 of the Immigration Act of 1917 [1] Congress ordained " That the following classes of aliens shall be excluded from admission into the United States: . . . prostitutes, or persons coming into the United States for the purpose of· prostitution or for any other immoral purpose." In reliance upon this mandate the petitioner. was ordered deported, and the question is whether she is within the proscribed class.

She is a citizen of Denmark, and first came here in 1922, making her home in Los Angeles, California, where she was employed as a domestic servant. In 1924 she became acquainted with a married man and in 1925 commenced

---

[1] Act of February 5, 1917, c. 29, 39 Stat. 874; U.S.C. Title 8, § 136.

having illicit relations with him; she did not live with him and was not supported by him, but resided where she was employed and supported herself from her own earnings, although he gave her money and clothing from time to time. In 1926 she made a trip to Denmark to visit her parents, and returned to Los Angeles in 1928, where she again took service as a domestic. In May, 1931, she made a second visit to Denmark to see her relatives. On this occasion she was accompanied by the man with whom she had been intimate, who paid part of her expenses. He went to Europe to attend a convention in Vienna. For a portion of the time they travelled together in Europe, having illicit relations. They returned together through Canada, coming from Vancouver to Seattle, where they entered the United States, she being admitted by the authorities as a returning resident. They went to a hotel in Seattle where they registered as man and wife. Upon her arrest by immigration officers she admitted her purpose to continue the relationship of husband and wife with the man, until they should arrive in Los Angeles, but denied that it was her intention to continue it after arrival in that city.

Upon these facts, developed at the hearing before a board of inspectors, the Secretary of Labor ordered the petitioner deported. She petitioned the District Court for a writ of habeas corpus, an order to show cause was issued and, after hearing, the writ was denied. On appeal the Circuit Court of Appeals affirmed.[2] The case is here on certiorari

The petitioner's previous residence here and her possession of a reëntry permit do not entitle her to remain in this country. *Lapina* v. *Williams*, 232 U.S. 78; *Lewis* v. *Frick*, 233 U.S. 291. She was liable to deportation at

[2] 65 F. (2d) 94.

any time within five years of her entry at the Port of Seattle, if she was a member of one of the prohibited classes of aliens.[3]

Was she a prostitute, or person coming into the country " for the purpose of prostitution or for any other immoral purpose " within the intent of § 3 of the Act of 1917? The respondent does not contend that she is a prostitute or that her purpose in entering the United States was to practice prostitution, but he affirms that she did come for an immoral purpose as defined by the statute. We cannot adopt this conclusion.

The principle of *ejusdem generis* limits the connotation of the words " any other immoral purpose " to such as are of like character with prostitution, *United States* v. *Bitty*, 208 U.S. 393, 401; and extra-marital relations, short of concubinage, fall short of that description.

Moreover, it can not be said that the petitioner's entry was for the purpose of having such relations. The respondent argues that as she had indulged in misconduct before leaving, had continued that misconduct while on her trip abroad and intended to continue it at least until she should arrive in Los Angeles, the Secretary of Labor was justified in disbelieving her statement that the relations would cease when she took up her residence in that city. This may be conceded; but it does not follow that her purpose in returning to the United States was to continue her irregular and improper conduct. The fact is that she was returning to her former residence, and nothing is disclosed to indicate that she did not intend, as she claimed, to resume her employment as a domestic. Her entry cannot be said to be with the purpose " only that she might live in a state of concubinage." *United States* v. *Bitty, supra,* 403. People not of good moral character,

---

[3] Act of February 5, 1917, c. 29, § 19, 39 Stat. 889; U.S.C. Title 8, § 155.

like others, travel from place to place and change their residence. But to say that because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance. Compare *Ex parte Rocha,* 30 F. (2d) 823.

The Mann Act [4] creates the offense of transporting in interstate commerce a woman or girl " for the purpose of prostitution or debauchery, or for any other immoral purpose . . ." This court has said that act " seeks to reach and punish the movement in interstate commerce of women and girls with a view to the accomplishment of the unlawful purposes prohibited." *Caminetti* v. *United States,* 242 U.S. 470, 491. Accordingly it has been held that the transportation denounced must have for its object or be a means of effecting or facilitating the sexual intercourse of the participants. If the purpose of the journey is not sexual intercourse, though that be contemplated, the statute is not violated. *Welsch* v. *United States,* 220 Fed. 764; *Fisher* v. *United States,* 266 Fed. 667; *Sloan* v. *United States,* 287 Fed. 91; *Alpert* v. *United States,* 12 F. (2d) 352; *Hunter* v. *United States,* 45 F. (2d) 55. So here, by the language of the act, the purpose of the entry is made controlling. And we think it plain that in no proper sense may the entry of the petitioner be said to have been for the purpose of immoral sexual relations.

*Reversed.*

MR. JUSTICE BUTLER, dissenting.

The statute forbids admission of " persons coming into the United States for the purpose of prostitution or for any other immoral purpose." The doctrine of this decision is that " extra-marital relations " of an unmarried

---

[4] Act of June 25, 1910, c. 395, 36 Stat. 825; U.S.C. Title 18, §§ 397–400.

woman that fall short of concubinage are not within the condemnation of the statute. But there is no ground for the assumption that petitioner is not the concubine of a married man. Since 1924 she has continued illicit relations with him. They cohabited as, and held themselves out to be, husband and wife abroad and in this country while not in the vicinity of his home. Admittedly, these relations were to continue until again they reached that neighborhood. There is abundant warrant for the Secretary's conclusion that petitioner returned to this country as, and intending to continue to be, that man's concubine. The findings quote Webster's definition—" a woman who cohabits with a man without being his wife." The Secretary found her to be such a person. He relied upon, and I think rightly applied, the opinion in *United States* v. *Bitty,* 208 U.S. 393.

Bitty was indicted under a provision of the Act of February 20, 1907, 34 Stat. 898, forbidding " the importation into the United States of any alien woman . . . for the purpose of prostitution, or for any other immoral purpose." The indictment alleged importation of a woman for an " immoral purpose," namely, " that she should live with him as his [Bitty's] concubine." The circuit court dismissed the indictment on the ground that the facts alleged did not constitute a violation of the statute. This court reversed. The phrase there construed is in the same words as that now under consideration. They undoubtedly have the same meaning. In that case defendant's counsel maintained that Congress did not by that Act intend to legislate against " those isolated cases where certain individuals come into this country with their mistresses." But repelling that construction, this court said (p. 401) that: " In forbidding the importation of alien women ' for any other immoral purpose,' Congress evidently thought that there were purposes in connection with the importations of alien women which, as in the

case of importations for prostitution, were to be deemed immoral." After reference to the rule of *ejusdem generis* relied on by the defendant, the court said (p. 402): "But that rule cannot avail the accused in this case; for, the immoral purpose charged in the indictment is of the same general class or kind as the one that controls in the importation of an alien woman for the purpose strictly of prostitution. The prostitute may, in the popular sense, be more degraded in character than the concubine, but the latter none the less must be held to lead an immoral life, if any regard whatever be had to the views that are almost universally held in this country, as to the relations which may rightfully, from the standpoint of morality, exist between man and woman, in the matter of sexual intercourse. . . . (p. 403.) The statute in question, it must be remembered, was intended to keep out of this country immigrants whose permanent residence here would not be desirable or for the common good, and we cannot suppose either that Congress intended to exempt from the operation of the statute the importation of an alien woman brought here only that she might live in a state of concubinage with the man importing her, or that it did not regard such an importation as being for an immoral purpose."

Moreover, the statute is not limited to prostitution and concubinage. While the Secretary regarded her as a concubine, his decision may not fairly be held to depend upon that characterization. Plainly it rests upon the ground there stated " that she entered for an immoral purpose " condemned by the statute. The law does not require him more definitely to classify. Refinements of nomenclature adopted for the sake of decency in speech may not be used to conjure up doubts and distinctions that obscure the real substance of the statute. The meaning of the findings is that petitioner's doings and course of living constitute a kind of immorality that bars admission. The

Secretary rightly may have deemed that her admitted intention temporarily to continue, when coupled with environment, opportunity and temptation under which habitual transgression had developed and for years persisted, amounted to a fixed purpose indefinitely to remain in concubinage. That is enough.

And there is nothing in the opinion in *United States* v. *Bitty, supra,* or elsewhere, to support the idea that Congress intended to keep out only those coming exclusively for the purposes referred to and to admit prostitutes, concubines and the like intending to follow legitimate occupation while practicing, incidentally or otherwise, any of the immoralities covered by the statute. Indeed, the court's opinion implies that if concubinage were her principal or primary purpose she ought to be excluded even though she intended regularly to pursue her work as a domestic. The making of exclusion to depend upon the determination whether the immoral purpose is dominant or subordinate goes far to strike down the statute by making its enforcement difficult and in many cases practically impossible. Congress undoubtedly intended to exclude those who entertain a purpose here to practice prostitution or immorality of that sort. That is the construction adopted by the Secretary, the District Court and the Circuit Court of Appeals. They are right. Petitioner's application for a writ of habeas corpus was properly denied.