## UNITED STATES v. PARSON.
### No. 13375.

District Court, S. D. California, Central Division.

Jan. 14, 1938.

Ben Harrison, U. S. Atty., and Carl Eardley and Ralph Lazarus, Asst. U. S. Attys., all of Los Angeles, Cal.

A. L. Wirin, of New York City, and Lee B. Stanton, of Los Angeles, Cal., for defendant.

152

YANKWICH, District Judge (after stating facts as above).

██ The·claim of immunity by reason ·of the guarantee against self-incrimination (Constitution of the United States, Amendment 5) is without merit. The Supreme Court has held that in view of the civil nature of deportation proceedings under the immigration law, the guarantees of the Fifth and Sixth Amendments do not apply to them. No violation of the guarantee against self-incrimination is involved in compelling one, whose right to remain in the United States' is challenged, to give testimony: See Fong Yue Ting v. United States, 1893, 149 U.S. 698, 730, 13 S.Ct. 1016, 37 L.Ed. 905; United States ex rel. Bilokumsky v. Tod, 1923, 263 U.S. 149, 44 ·S.Ct. 54, 68 L.Ed. 221; Zakonaite v. Wolf, 1912, 226 U.S. 272, 33 S.Ct. 31, 57 L.Ed. 218; United States v. Lee Hee, 2 Cir., 1932, 60 F.2d 924; Ishihama v. Carr, 9 Cir., 1936, 81 F.2d 1012; Hays v. Zahariades, 8 Cir., 1937, 90 F.2d 3.

██ The more serious question is the application of the provisions of section 152, 8 U.S.C.A., to deportation proceedings. The facts relating to the unfairness throughout the proceedings cannot be inquired into in this proceeding. We are not dealing with a final order of deportation.

We cannot, when a complete administrative scheme has been set up for the determination of certain matters, review it until the final stage is reached. The remedy of reviewing the arbitrariness in this case is still available ' to the alien, should' the immigration officers, after the completion of the present inquiry, either attempt to enforce the old warrant or issue a new one. Should the government attempt to execute the old warrant, then the inquiry of fairness will extend to all the proceedings from the beginning to the present time. See cases above, and Ex parte Nunez, 9 Cir., 1937, 93 F.2d 41; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146; United States ex rel. Vajtauer v. Commissioner, 1927, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; Tod v. Waldman, 1924, 266 U.S. 113, 45 S.Ct. 85, 69 L.Ed. 195.[1] Before that stage is reached, we cannot interfere. As said in Impiriale v. Perkins, 1933, 62 App.D.C. 279, 66 F.2d 805, 806:

"Since deportation proceedings are administrative and the action of the Secretary of Labor is intended by the statutes to be final, *there is no regulatory power in the courts to control the course of such proceedings while pending in the Department.*

"The jurisdiction of the courts is contingent, and usually to be exercised by a writ of habeas corpus ex post facto of an order of deportation." (Italics added.)

██ The old warrant has become *functus officio* because it was not executed within a reasonable time, and no excuse for the long delay appears. United States v. Wallis, 2 Cir., 1922, 279 F. 401; Caranica v. Nagle, 9 Cir., 1928, 28 F.2d 955; Seif v. Nagle, 9 Cir., 1926, 14 F.2d 416. Hence the present inquiry is a new inquiry or an investigation leading to the determination

---

[1] Over a long course of years the writer has expressed repeatedly his condemnation of lawlessness on the part of those charged with the enforcement of the law. The disservice and harm which such acts do to our legal establishment and the illusory character of the civil remedies which the law affords in such cases, with special reference to the law of California, were treated fully by the writer in an article entitled "The Lawless Enforcement of the Law (1935) 9 Southern California Law Review, 14; 2 Current Legal Thought, 411; I there said:

"In these days, when we hear so many complaints about disrespect for law, it is sound social policy to heed the warning of those who, like Mr. Justice Brandeis, feel that nothing encourages such disrespect so much as the lawless acts of the guardians of the law—those charged with its enforcement.

"And it is also good ethics to demand in those charged with law enforcement civilized behavior. A different conduct, based upon the plea of justifiable ends, leads us right into Machiavelli's amoral maxim: 'Right and wrong have nothing to do with government.'"

If, during the course·of the proceedings, any illegal acts were committed against the alien of a character affecting the fairness of the proceeding, they cannot be inquired into at the present time.

of the right of the alien to remain in the United States.

The order to answer was issued under the authority of section 152, 8 U.S.C.A., which states: "Any commissioner of immigration or inspector in charge shall also have power to require by subpœna the attendance and testimony of witnesses before said inspectors and the production of books, papers, and documents touching the right of any alien to enter, reenter, reside in, or pass through the United States, and to that end may invoke the aid of any court of the United States."

If we examine the section in which the clause appears, it seems in the wrong place. It is preceded by provisions relating to the right of inspectors to examine persons who seek admission into the United States and is followed by provisions penalizing those who seek to interfere with the performance of these duties.

 However, it is a cardinal rule of statutory construction that effect will be given to legislative intent and legislative language, and that an interpretation should not be adopted which would make a provision meaningless or senseless. See Bird v. United States, 1902, 187 U.S. 118, 23 S. Ct. 42, 47 L.Ed. 100; Unity v. Burrage, 1880, 103 U.S. 447, 456, 26 L.Ed. 405. The right to "enter, re-enter, or pass through" the United States, of which the enactment speaks, could refer only to persons who seek admission, by seeking to enter for the first time, or to re-enter or to pass through the United States on their way to another country. But the words, "reside in the United States," could only refer to a person *who is in the United States* and desires to continue to reside therein. They were so interpreted in Loufakis v. United States, 3 Cir., 1936, 81 F.2d 966. The interpretation accords with the evident aim of the statute.

 The power given to courts to command attendance before the Commissioner or Inspector and compel testimony to be given would be meaningless, unless we postulate that the Congress had in mind persons already within the United States. An alien, when he seeks admission to the United States, does not have the power to command what we shall or shall not do. We have the right to exclude whomever we wish and for any reason whatsoever, because we do not approve an alien's political or social ideas, or he belongs to groups which are likely to become a pub-

lic charge, or for other similar reasons. See 8 U.S.C.A. §§ 136, 137; United States v. Smith, 1933, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298; Bugajewitz v. Adams, 1913, 228 U.S. 585, 33 S.Ct. 607, 57 L.Ed. 978; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146; Hansen v. Haff, 1934, 291 U.S. 559, 54 S.Ct. 494, 78 L.Ed. 968.

 If an alien seeking admission should decline to answer questions concerning his right to be in the United States, it would be a useless act on the part of the Immigration Commissioner or Inspector to seek an order from a United States Court to compel him to give testimony. Why ask for it when all he need do is to say to the alien, "If you do not answer the questions concerning your right to enter the United States, you shall not enter." If an order should be secured, how would it be served on the alien? If the alien be detained at a seacoast port, pending the determination of his right to enter, he might be detained on an isle or on board ship and there served. But assume the alien is at the Canadian or Mexican border and is not allowed to cross it. Process cannot be issued by a District Court effective beyond its territorial jurisdiction. Nor can it be served there. See 28 U.S.C.A. §§ 377, 503, 504; Pacific R. R. v. Missouri Pac. R. Co., C.C.Mo.1880, 3 F. 772; Mitchell v. Dexter, 1 Cir., 1917, 244 F. 926; Sugarman Iron & Metal Co. v. Morse Bros. Mach. & Supply Co., D. C.1927, 19 F.2d 589. Unless, therefore, we give effect to the words "reside in the United States," and apply the clause to deportation proceedings, the right of immigration authorities, in the performance of their duties under the law, in enforcing the uncontested right of a sovereign power to determine whom it shall receive within its borders, would be rendered ineffective.

 Courts are often asked to determine whether limited scope should be given to an enactment merely because it either is not in the proper place or, from its surroundings, it might be construed as of limited scope. In such cases, they consider the enactment with reference to the subject to which it relates. And when they find that it relates clearly to a particular subject, they decline to limit its scope merely because it is in the wrong place. So in Maul v. United States, 1927, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171,

the court held that although the power to seize on the high seas beyond the twelve-mile limit refers specifically only to officers of the Customs, officers of the Coast Guard, established for the protection of customs, also had the power. There, an ambiguity in an enactment was seized upon in an attempt to abridge the power given; but the court declined to heed the appeal. Here we are asked to make a specific provision nugatory merely because it is in the wrong place.

What precedes indicates that both reason and authority stand in the way. See United States v. Tappan, 1826, 11 Wheat. 419, 426, 6 L.Ed. 509. I am, therefore, of the view that the order, with the violation of which the defendant is charged, was properly issued. As there has been no final order of deportation, and no attempt to execute the old deportation order, in other words, absent an order which has administrative finality, the question of the fairness of the hearings preceding the present proceeding is not before the court. Nor is the right to free speech or freedom to profess religious, political, or economic ideals of one's own choosing involved here. This, I have had occasion to point out repeatedly during the course of the proceeding. The constitutional guaranties of free worship and free expression apply to residents, either citizens or aliens, who are lawfully in the United States. But an alien seeking admission to the United States must not profess the heterodox doctrine of anarchy, to the adherents of which the government has seen fit to deny admission. 8 U.S.C.A. § 137. This is a congressional fiat in the exercise of the right of sovereignty which no court can disregard. And that it is within the Constitution is undisputed. As said in United States ex rel. Turner v. Williams, 1904, 194 U.S. 279, 292, 294, 24 S.Ct. 719, 723, 48 L.Ed. 979:

"But it is said that the act violates the 1st Amendment, which prohibits the passage of any law. 'respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.'

"We are at a loss to understand in what way the act is obnoxious to this objection. It has no reference to an establishment of religion, nor does it prohibit the free exercise thereof; nor abridge the freedom of speech or of the press; nor the right of the people to assemble and petition the government for a redress of grievances. It is, of course, true, that if an alien is not permitted to enter this country, or, having entered contrary to law, is expelled, he is in fact cut off from worshipping or speaking or publishing or petitioning in the country; but that is merely because of his exclusion therefrom. He does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law. To appeal to the Constitution is to concede that this is a land governed by that supreme law, and as under it the power to exclude has been determined to exist, those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise.

"Appellant's contention really comes to this: that the act is unconstitutional so far as it provides for the exclusion of an alien because he is an anarchist.

"The argument seems to be that, conceding that Congress has the power to shut out any alien, the power, nevertheless, does not extend to some aliens, and that if the act includes all alien anarchists, it is unconstitutional, because some anarchists are merely political philosophers, whose teachings are beneficial rather than otherwise. * * *

"If the word 'anarchists' should be interpreted as including aliens whose anarchistic views are professed as those of political philosophers, innocent of evil intent, it would follow that Congress was of opinion that the tendency of the general exploitation of such views is so dangerous to the public weal that aliens who hold and advocate them would be undesirable additions to our population, whether permanently or temporarily, whether many or few; and, in the light of previous decisions, the act, even in this aspect, would not be unconstitutional, as applicable to any alien who is opposed to all organized government.

"We are not to be understood as depreciating the vital importance of freedom of speech and of the press, or as suggesting limitations on the spirit of liberty, in itself unconquerable, but this case does not involve those considerations. The flaming brand which guards the realm where no human government is needed still bars the entrance; and as long as human governments endure they cannot be denied the

power of self-preservation, as that question is presented here." [2]

And, see, Sormunen v. Nagle, 9 Cir., 1932, 59 F.2d 398; Nicoli v. Briggs, 10 Cir., 1936, 83 F.2d 375.

The demurrer to the plea in abatement will be sustained.

The plea in bar will be denied.

Exception to the defendant. [3]

---

[2] Counsel have criticized the case as being out of line with the more recent pronouncements of the Supreme Court on questions affecting civil liberties. I find nothing in any of the later cases dealing with the right of exclusion or with the right of freedom of expression (Near v. Minnesota, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; DeJonge v. Oregon, 1936, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Herndon v. Lowry, 1937, 301, U. S. 242, 57 S.Ct. 732, 81 L.Ed. 1066) weakening the force of this decision or indicating any intention on the part of the court to deviate from it. These cases define the constitutional limits beyond which legislative bodies may not go in abridging the right of freedom of expression of citizens and residents of the United States. But one seeking admission to the United States, or an alien whose deportation is sought because he professes a heterodox doctrine, cannot invoke the guaranty of freedom of expression as a shield to protect him against the expressed intention of a statute denying to alien adherents of certain doctrines the right to enter the United States. United States ex. rel. Turner v. Williams, supra, so held. And it is still the law. It has been followed consistently by the Circuit Courts of Appeal and the Supreme Court itself. It was cited by the Supreme Court in 1933 in United States v. Smith, 289 U.S. 422, 425, 53 S.Ct. 665, 667, 77 L.Ed. 1298, where the court said: "The power of Congress to prescribe the terms and conditions upon which aliens may enter or remain in the United States is no longer open to serious question."

It was cited by the Circuit Court of Appeals for the Tenth Circuit on April 7, 1937, in Nicoli v. Briggs, infra. In that case, the sweeping power of the United States to prescribe the conditions upon which it will admit aliens is stated in this language: "The United States has plenary power to admit, exclude, or deport aliens, *absolutely or upon any conditions it cares to impose.* Such right is inherent in sovereignty and inalienable; it may be exercised in war and peace, and is essential to the safety, independence, and welfare of its citizens. Unless a claim of citizenship is made and supported by substantial evidence, Congress may repose the power to deport in the executive department. * * * Deportation proceedings are *civil* and *not criminal;* being confided to the executive department, evidentiary rules followed in judicial proceedings *need not* be adhered to." (Italics added.) Nicoli v. Briggs, supra, 83 F.2d 375, 376.

The civil nature of the remedy, and the fact that the administrative body which enforces it is not bound by the rules of evidence obtaining either in civil or criminal cases, make all argument about free speech and the lawless enforcement of the law beside the point. The redress against administrative lawlessness given to the alien is by way of habeas corpus, *after* an order of deportation has been made. In such a hearing, the fairness of the proceedings against him may be inquired into. Until such an order is made, the alien, when ordered by a court, must, under the direct mandate of the Congress, answer questions concerning his right to be or remain in the United States. If he does not do so, he may be punished for contempt. *That is all that is involved in this case.* And when the Congress and the higher courts have spoken in unmistakable language, the judge of a lower court cannot exercise the right of private opinion. He must always remember the statement of Mr. Justice Cardozo: "The judge is not to innovate at pleasure. He is not a knight errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.'" Cardozo: The Nature of the Judicial Process, 141.

[3] After the showing made by the government and the failure of the defendant to deny any of the facts relating to his refusal to answer questions, the court found him in contempt and ordered him imprisoned in a county jail for a period of six months, "the imprisonment to terminate either upon the execution upon the defendant of a Warrant of Deportation to a foreign country or upon proof to the Court by proper showing, by certificate to be filed in court, that the defendant has submitted himself to the proper Immigration authorities for interrogation regarding the defendant's right to remain in the United States."