**UNITED STATES of America, Appellee,**

v.

**Vernon MILLER, Defendant–Appellant.**

**Docket No. 97–1525**

United States Court of Appeals, Second Circuit.

Argued May 13, 1998.

Decided July 10, 1998.

John P. Cooney, Jr., New York City, (Eric F. Grossman, of Counsel), for Defendant–Appellant.

William E. Craco, New York City, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney for the Southern District of New York, Alexandra A.E. Shapiro, Assistant United States Attorney, of Counsel), for Appellee.

Before: FEINBERG and WALKER, Circuit Judges, and SHADUR, District Judge.[*]

FEINBERG, Circuit Judge:

Vernon Miller appeals from his conviction, after a jury trial in the United States District Court for the Southern District of New York (Jed S. Rakoff, J.), for coercing travel, 18 U.S.C. § 2422, and transporting minors, 18 U.S.C. § 2423(a), in each case in interstate commerce and for purposes of prostitution or other criminal sexual activity. Miller was sentenced principally to concurrent six-year prison terms on the two counts. Miller argues that the district court erred in instructing the jury that it could convict if it found that prostitution or illegal sexual activity was one of several "dominant purposes" for the travel. Miller also argues that the district court erred in refusing to suppress certain evidence. We find that the district court properly instructed the jury, and that even assuming for argument that the evidence was not properly admitted, any error was harmless. We affirm.

## I. Background

### A. The Criminal Conduct

Miller met the two minors involved in this case in March 1995 in his Chicago neighborhood, where all three were involved with the Latin Kings street gang. One of the girls, who due to her age and the nature of the case will be identified only as LK, was 16 years old at the time of the relevant events, while the other, who will be identified only as MG, was 15 years old. Miller was 34 years old. Miller began a sexual relationship with LK, and the two eventually became engaged. In September 1995, both LK and MG ran away from home. The three broke off from the Latin Kings and moved to a different Chicago neighborhood.

Miller had no job, and the two girls soon ended up working for a friend of Miller's

---

[*] Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

providing massages that culminated with masturbation of the clients. The girls did not, however, provide other sexual services. The three soon established a similar business of their own under the name Body Masseuse International (BMI). Miller would drive the girls to the clients' hotels, and then wait outside in the car and collect the money earned by the girls. At various points during their relationship, Miller was violent towards both girls.

While working in Chicago, Miller and the girls discussed moving their business to other cities, including New York. Miller told the girls, however, that he was worried the authorities "would try to pin on him transporting minors across state lines." In December 1996, MG was arrested for prostitution. Upon her release, Miller told the girls that he feared the police knew of their operation. The three left for Atlanta the next day, but lacking the money to establish BMI there, they had to return to Chicago.

Towards the end of December 1996, after an argument with Miller, LK returned to her old neighborhood. While there, she spoke with friends who told her that the Latin Kings had issued "Terminate On Sight" orders for the three because they had severed their association with the gang. Miller managed to persuade LK to return the same day. Upon her return, he beat her and told her that because she had been seen in her old neighborhood, her parents or the police could track them down. He told her that they had to leave Chicago. Both girls told Miller that they did not want to go to New York, but Miller threatened LK that he would kill her if she did not go to New York because she would "tell everything" if she stayed. The next morning, LK again refused to go to New York, and tried to leave the hotel without Miller. He chased her down and put her into his car. Miller allowed LK to phone her family, but held his fist to her head as she spoke and warned her not to tell her family "about the business or where they were going."

After driving through a severe blizzard, the three arrived in New York City. Miller arranged for pagers and BMI business cards printed with the pager numbers, and the three re-established their operation. Shortly thereafter, LK and MG met a woman named Martha who ran a brothel. The girls began performing their services part-time at Martha's brothel. Miller would drive the girls to the brothel and continued to control the money they earned. Miller also continued to abuse the girls. For example, on several occasions MG performed full sexual intercourse at the brothel, because Miller had been complaining that she was not making enough and it paid more than the massage and masturbation service. Upon discovering that MG had engaged in "full-service" prostitution, Miller beat her and choked her into unconsciousness.

In late February 1996, LK refused to go to work at the brothel. She told Miller that she was tired of supporting him. Miller grabbed LK by the hair, and began to hit and kick her. LK went to the brothel, and discussed her situation with Martha. Martha purchased an airline ticket back to Chicago for LK, who used it to return to her family that night.

That evening, Martha spoke with two New York City detectives from the Vice Enforcement Squad about MG and LK. The detectives then posed as brothel operators for a meeting with MG, and proposed that the girls work for them. MG relayed the proposal to Miller, who told her that he was interested. Later the same evening, one of the detectives (Margaret Martinez), still posing as a brothel operator, met with Miller. Miller told Martinez that he had someone on an outcall and was too busy to discuss the proposal but agreed to meet with Martinez the next day.

Miller was arrested upon leaving the brothel. MG was found the next day handing out BMI business cards at a downtown hotel. After his arrest, Miller admitted to the police that he had a massage business with the girls, but claimed that it did not involve prostitution. Before trial, Miller attempted to suppress this post-arrest admission, but the district court ruled it admissible and Miller has not challenged that determination on appeal. Miller was charged with various state law crimes. In March 1996, Miller was charged in a federal indictment

with violating 18 U.S.C. §§ 2422 and 2423(a).[1] (The state charges were later dropped). Those statutes currently provide, in relevant part, as follows:

§ 2422(a) [2]

Whoever knowingly ... coerces any individual to travel in interstate ... commerce ... to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined ... or imprisoned not more than five years, or both.

§ 2423(a)

A person who knowingly transports any individual under the age of 18 years in interstate ... commerce ... with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined ... or imprisoned not more than ten years, or both.

### B. The Disputed Search and Evidentiary Rulings

After Miller's arrest, one of the girls told Detective Kevin Mannion that the property they had left at their hotel included a camera and film containing nude photographs of them taken by Miller. Mannion spoke with Mr. Lewis, the manager of the hotel, who informed him that the three had not paid their bill or returned for their property, and that their goods had been packed in bags and stored in a different room. On February 29, 1996, Mannion obtained a warrant to search for the camera and film in the rooms that the three had occupied and the room containing their property. Before the search, Lewis told Mannion that he intended to dispose of the property. Mannion located and seized the camera in the last bag to be searched. In the process, Mannion also found and seized a bundle of BMI business cards, two beepers, a directory of hotels, and a cellular telephone. Although Lewis was the one who packed Miller's belongings into the bags, Mannion did not ask Lewis which bag contained the camera and film.

Prior to trial, Miller moved to suppress all of these items other than the camera and film, arguing that the search violated the Fourth Amendment. After an evidentiary hearing, Miller submitted an affirmation which stated that on February 27, 1996, the day after his arrest, he asked Lewis to pack up the items in their rooms and "store them safely for me," and that Lewis agreed to do so.

The district court (Barbara S. Jones, J.) denied Miller's motion. In February 1997, the court held that that most of the items other than the camera and film were found in plain view during a lawful search. A month later, the court held that as to other items, Miller had no standing to protest the search because he had no legitimate expectation of privacy in the hotel room in which the property had been stored. The judge relied upon various cases including *United States v. Rahme*, 813 F.2d 31 (2d Cir.1987), in which this court stated that "[o]nce the hotel, in a position adverse to the guest, properly takes possession of ... luggage, the guest no longer has the right to control access to it and can have no legitimate expectation of privacy in it." *Id.* at 35. The court noted that Miller neither paid for nor offered to pay for the storage of the goods, and that hotel employees had ready access to the room in which the property was stored. Miller argued that Lewis's agreement to store the property created a bailment, and that under *United States v. Perea*, 986 F.2d 633 (2d Cir.1993), such a bailment does not terminate his legitimate expectation of privacy. The district court held that *Perea* stood only for the proposition that "in the Fourth Amendment context, bailees can have sufficient interest in bailed property to give them standing to object to its seizure or search." *Id.* at 640 (citations omitted). The court noted that Lewis, the alleged bailee, had not challenged the search and in fact had told the police that he was preparing to dispose of the items left in the room.

---

**1.** The indictment also charged Miller with violating 18 U.S.C. § 2421, but the government later agreed to drop this charge.

**2.** At the time of Miller's offense, § 2422 consisted only of what is now § 2422(a). No substantive changes to the applicable language were made in the amendment that added § 2422(b).

## C. · The Disputed Jury Instructions

In February 1997, the case was transferred to Judge Rakoff for trial. Miller argued that the jury, in order to convict, had to find that *the* dominant purpose for the trip from Chicago to New York—rather than simply *a* dominant purpose—was to have the girls engage in prostitution or other criminal sexual conduct. For this proposition, Miller relied on *Mortensen v. United States,* 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331 (1944), which involved a precursor to the statutes under which Miller was charged. The district court rejected that argument, relying on *United States v. Sirois,* 87 F.3d 34 (2d Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 328, 136 L.Ed.2d 241 (1996). In *Sirois,* the defendant offered two motives for his transportation of minors, both of which were illegal, but only one of which was proscribed by the federal statute in question, 18 U.S.C. § 2251. This court held that the Supreme Court in *Mortensen* "had no occasion to decide whether an illegal purpose had to be exclusive or even paramount" because multiple motives were not involved in that case. The *Sirois* court held that a defendant may be convicted as long as the forbidden purpose was "one of the dominant motives" and "not merely an incident of the transportation." Sirois, 87 F.3d at 39. Guided by *Sirois,* Judge Rakoff instructed the jury that:

> the government must prove that it was part of the defendant's conscious purpose in transporting these minors across state lines to have one or both of them engage in prostitution or other criminal sexual conduct. It need not have been his only purpose or motivation, but it must have been more than merely incidental; it must have been one of the dominant purposes of the trip.

The jury found Miller guilty of violating both § 2422 and § 2423(a). This appeal followed.

## II. Discussion

### A. The Disputed Jury Instructions

#### 1. Standard of Review

Miller's primary argument on appeal is that the district court incorrectly instructed the jury as to the applicable law. We review *de novo* whether the district court accurately stated the law. *United States v. Malpeso,* 115 F.3d 155, 166 (2d Cir.1997). Miller bears "the burden of showing that his requested charge accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Ouimette,* 798 F.2d 47, 49 (2d Cir.1986).

#### 2. Arguments of the Parties

On appeal, Miller renews his argument that under *Mortensen,* prostitution or other criminal sexual activity must be "*the* dominant purpose" of the interstate travel rather than only "*one* of the dominant purposes," as the judge charged. He relies on dictionary definitions of "dominant" to establish that while a defendant can have many motives, there can only be one "dominant" motive. See e.g., The Oxford English Dictionary 946 (2d ed.1994) (defining dominant as "*most influential*") (emphasis added). Miller argues that use of "dominant" in *Mortensen* cannot be dismissed as dicta because this court adopted that standard in *United States v. McConney,* 329 F.2d 467, 469 (2d Cir.1964), because *Hansen v. Haff,* 291 U.S. 559, 562–63, 54 S.Ct. 494, 78 L.Ed. 968 (1934), which was relied on by *Mortensen,* involved multiple motives, and because "the dominant purpose" language was repeated in subsequent cases. See e.g., *Hawkins v. United States,* 358 U.S. 74, 79, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); *Cleveland v. United States,* 329 U.S. 14, 20, 67 S.Ct. 13, 91 L.Ed. 12 (1946). He argues that the dominant purpose requirement was created to ensure an adequate basis for federal jurisdiction and to reflect Congressional concern about encroaching on the states' jurisdiction over prostitution-related crimes.

As for *Sirois,* Miller contends that the case failed to address our prior decision in *McConney,* and is distinguishable because the defendant in *Sirois* was charged under a child pornography statute which, unlike the statute interpreted in *Mortensen,* was motivated by a Congressional finding that the large majority of states did not have laws to deal with the problem. Furthermore, Miller notes that the alleged dominant purpose proffered by the defendant in *Sirois* was itself illegal, whereas in this case his domi-

nant purpose in traveling to New York was to escape the threat of the Latin Kings. Finally, Miller argues that the rule of lenity requires that any doubts as to the reach of the statutes be resolved in his favor.

In response, the government points out that Miller's argument is not supported by the actual text of the statutes, which make no reference to a "dominant" purpose. It argues that this court did not adopt Miller's interpretation of the Mortensen standard in McConney, and has since held in Sirois that the reference to a "dominant" purpose in Mortensen was dicta because in that case "the Court was careful to point out that the *only* purpose of the ... trip was to enjoy a vacation." Sirois, 87 F.3d at 39. The government emphasizes that every other circuit that has considered this issue has rejected the interpretation suggested by Miller. See e.g., United States v. Vang, 128 F.3d 1065, 1072 (7th Cir.1997), cert. denied, — U.S. ——, 118 S.Ct. 1107, 140 L.Ed.2d 160 (1998); United States v. Meacham, 115 F.3d 1488, 1495 (10th Cir.1997); United States v. Campbell, 49 F.3d 1079, 1082–83 (5th Cir.1995); United States v. Ellis, *935 F.2d 385, 389–90 (1st Cir.1991). The government rejects Miller's appeal to the rule of lenity, arguing that the statutory text clearly proscribes the conduct engaged in by Miller. Finally, it argues that even if the instruction were incorrect, Miller cannot demonstrate any prejudice in light of the overwhelming evidence that Miller was not motivated by the threat of the Latin Kings when he took the girls to New York. For example, the trip to Atlanta took place immediately after MG was arrested for prostitution but before the threat.*

### 3. Discussion

■ We conclude that Miller cannot avoid our holding in Sirois, as well as the holding of every circuit that has considered and rejected the interpretation he offers. It is true that Sirois involved a different statute, but the Sirois panel interpreted the very language from Mortensen on which Miller relies and reached a conclusion directly contrary to the one he would have us adopt. Miller also argues that Sirois did not specifically address other cases that used "the dominant purpose" language, such as McConney.

However, McConney did not involve multiple purposes. In that case, we found that there was insufficient evidence to establish that the defendant was even aware, much less intended, that his wife was going to engage in prostitution at the conclusion of their journey. Likewise, the Supreme Court cases that Miller cites do not support his position. Hansen involved a mistress who was simply returning home from a trip abroad with her married paramour. Hansen was clearly a case in which any immoral purpose was purely incidental, and this is reflected in the language from that case quoted in Mortensen, which stated that "[p]eople not of good moral character, like others, travel from place to place and change their residence. But to say that, because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance." Mortensen, 322 U.S. at 376, 64 S.Ct. 1037 (quoting Hansen, 291 U.S. at 562–63, 54 S.Ct. 494).

■ Moreover, we think that Miller oversimplifies the meaning of "dominant." He is correct that the word has a connotation of exclusive supremacy. But we do not think his interpretation of the term is the only reasonable one. If Miller's restrictive interpretation of "dominant" were correct the word could never be applied to a group, because it would incorrectly lump together one "dominant" member of that group with other members who—at least by Miller's definition—would actually be "non-dominant." But in everyday speech we can and do describe groups as "dominant." For example, it makes perfect sense to discuss the "dominant companies" in an industry or the "dominant teams" in a league, and all we mean by describing these companies or teams as "dominant" is that they are relatively more successful or influential than others. Likewise, in the context of multiple purposes, "dominant" simply means that these motivations predominate over other, less powerful motivations for conduct. See e.g., Forrest v. United States, 363 F.2d 348, 349 (5th Cir. 1966) (referring to "one of the dominant purposes" or the "efficient and compelling purposes" in the mind of the accused); Dunn v.

*United States,* 190 F.2d 496, 497–98 (10th Cir.1951) (same); *United States v. Snow,* 507 F.2d 22, 23–24 (7th Cir.1974) (government must prove "*a* dominant purpose") (then-Circuit Judge Stevens) (emphasis in original). In short, we find no error in the judge's charge here to the jury on this issue.

### B. The Disputed Search and Evidentiary Rulings

#### 1. Standard of Review

■ Miller also argues that the district court erred in denying his motion to suppress the items found during Mannion's search. In reviewing this contention, we view the evidence in the light most favorable to the government. The district court's factual findings are reviewed for clear error, and its legal conclusions are subject to *de novo* review. *United States v. Peterson,* 100 F.3d 7, 11 (2d Cir.1996).

#### 2. Arguments of the Parties

In order to have standing to challenge the search of the items left at the hotel, Miller must demonstrate "(a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy." *Perea,* 986 F.2d at 639.

Miller argues that the district court erred in relying on *Rahme* to establish that he had no standing to challenge the search, because here (unlike in *Rahme* ) Lewis agreed to store his property. The district court noted that Miller did not offer to pay for such storage. But Miller argues that *United States v. Fields,* which held that a non-paying guest had a legitimate expectation of privacy, makes it clear that such expectation does not necessarily hinge on payment. 113 F.3d 313, 320 (2d Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997). The district court also noted that hotel employees had access to the room in which Miller's property was stored, but Miller points out that hotel employees have access to all rooms, and such access does not preclude a finding that he had a reasonable expectation of privacy in the stored goods. *Stoner v. California,* 376 U.S. 483, 489–90, 84 S.Ct.

889, 11 L.Ed.2d 856 (1964) (hotel guests have standing under Fourth Amendment notwithstanding "implied or express permission to such persons as maids, janitors or repairmen to enter [their] room in the performance of their duties") (internal quotation marks omitted). Miller argues that even if Lewis was preparing to dispose of the items, Lewis's agreement to safeguard the items gave Miller a reasonable expectation of privacy in the items.

On the merits of the search, Miller notes that Mannion could have asked Lewis to identify the bag containing the camera and film, which would have limited the scope of the search to the items mentioned in the warrant. Miller argues that the plain view doctrine is not applicable because that doctrine "may not be used to extend a general exploratory search from one object to another until an incriminating item turns up." *United States v. George,* 975 F.2d 72, 80 (2d Cir.1992). He argues that his failure to dispute that he ran a massage business with the girls at trial does not render any error harmless because the district court's decision to admit the disputed evidence necessarily shaped his trial strategy.

The government responds that the facts in this case are comparable to those in *Rahme.* It argues that Lewis's agreement to store Miller's belongings is not sufficient to establish Miller's standing. Lewis did not agree that others would be excluded from access to the property, Miller did not specify how the property would be stored, and MG and LK would have had access to the property in any event. As to the merits of the search, the government argues that Mannion was lawfully searching for the camera and film, and simply did not find those items until he came to the last bag. Finally, the government argues that even if the motion to suppress should have been granted, any error was harmless beyond a reasonable doubt. *United States v. Lasanta,* 978 F.2d 1300, 1306 (2d Cir.1992) (applying harmless error doctrine to Fourth Amendment search and seizure claim). The government notes that Miller never contested running the massage business in New York.

### 3. Discussion

The issue whether Miller had standing to challenge the search is a close one. While the reasoning in *Rahme* makes good sense, this case involves several complicating factors not present in that case. The government has not disputed that Lewis agreed to store Miller's property. Therefore, it is arguable that at least for some length of time, Miller had an expectation of privacy in the goods that society might consider reasonable whether or not payment was involved. Lewis's statement that he was getting ready to dispose of the goods further complicates matters. We need not decide the standing issue, however, and we therefore express no opinion upon it. Even assuming for argument that Miller had standing and that the business cards, cell phone, beepers, and hotel directory should not have been admitted, the government is correct that any error was harmless beyond a reasonable doubt. The items seized during the search establish only that Miller and the girls ran a massage business. Notwithstanding Miller's suggestion that he would have disputed the existence of the massage business but for the admission of the disputed materials, the existence of BMI was established by overwhelming evidence, including the testimony of MG and LK, Miller's tape-recorded statement to Martinez that he had a girl on an outcall, Miller's post-arrest admission that he ran a massage business with the girls, and the fact that when MG was found after Miller's arrest, she was handing out BMI business cards at a downtown hotel.

We have considered all of Miller's arguments and find that they do not require a reversal here. For the reasons stated above, we affirm the judgment of the district court.