## LANGFORD v. UNITED STATES.
### No. 12156.

United States Court of Appeals
Ninth Circuit.
Oct. 27, 1949.
Rehearing Denied Nov. 28, 1949.

Henry G. Bodkin, Jr., William K. Stewart, Los Angeles, Cal., for appellant.

James M. Carter, U. S. Attorney, Ernest A. Tolin, Chief Asst., Norman Neukom and Ray M. Steele, Asst. U. S. Attorneys, Los Angeles, Cal., for appellee.

Before DENMAN, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Langford, the appellant, was convicted of violation of the Mann Act, 18 U.S.C.A. § 398 [now § 2421]. The indictment was in two counts. Count One charged the transportation of a woman, one Carol Jones, in foreign commerce, from Los Angeles County, California, to Tiajuana, Mexico, for purposes of prostitution, debauchery and other immoral practices. The second count charged transportation of the same woman, for the same purposes, from

Tiajuana to Los Angeles County. Conviction was on Count Two only.

The evidence showed that at the time of the transportation mentioned in Count One, the parties went to Mexico to be married there, and that the transportation charged in Count Two was their return trip. It is urged upon this appeal that notwithstanding the evidence of prior and subsequent prostitution, the entire trip, both going and returning, was an innocent one under the rule of Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331. Therefore, it is said, the verdict is against law, and not supported by the evidence.

It is also contended that the judgment must be reversed because of certain remarks made by the prosecutor including comment upon failure of the defendant to testify, and because of the admission of certain evidence claimed to be irrelevant and prejudicial.

A consideration of the question of the sufficiency of the evidence to sustain a conviction requires a rather complete review of the testimony.

Jones, the prosecuting witness, was white and a college graduate, with a degree in sociology and applied psychology. She had been employed as a case worker in Los Angeles. She testified that she met Langford, a Negro, at a Los Angeles night club and that she voluntarily went to his home to live with him in January, 1948. A week or so later, Langford brought four sailors home with him and asked her to perform acts of sexual intercourse with them. She refused at first, but consented when Langford slapped her. At this time there was another girl present whom Jones described as a prostitute for herself and Langford. Over objection, Jones testified that she had seen this other girl give Langford money on several occasions.

She turned the money received from the sailors over to Langford. Although she had not been a prostitute until this time she then became one. She testified that she entertained between three and seven men a day and that she never received less than $10 per man. Langford brought customers to her as did other men, whom she termed "trick hustlers" and who received a fee for these services. Jones soon built up a large "call list" of steady customers. All money was turned over to Langford.

Jones testified that, although she was in love with Langford, she left him twice in March. The first time, he saw her in a car with some men and dragged her out of it so she returned to his home. She left him the second time, because he had slapped her and beaten her with a belt. On this occasion she took a room in a private home and did not engage in prostitution for several days. On the evening of April 5, Langford telephoned her and asked permission to come to see her. He came very humbly, protesting his love for her, and proposed marriage, a subject Jones had previously broached to him. Jones accepted this proposal although Langford told her she would still have to engage in prostitution for a month or two until his car was paid for. However, at this time there was an anti-miscegenation statute in effect in California[1] so the parties decided to drive to Tiajuana, Mexico, where the law permitted marriage between the races.

That night Jones and a man named Bryant, a friend of Langford, were driven by Langford in his automobile to Tiajuana. When they arrived they found that it was too late to have the marriage performed. Both Jones and Bryant testified that the purpose of the trip to Tiajuana was to have the marriage performed.

In Tiajuana they went to a nightclub. Jones testified that while they were there Bryant was asked to sing. While he was singing, she decided that she would like to have a photograph taken of Langford and herself so they left the nightclub to seek a photographer. Before they found one, however, Langford was approached by a sailor. After talking with the sailor, Langford turned to her and said that they needed some money. She thereupon got into the back seat of Langford's car with the

---

1. Cal. Civil Code, 1941, Sec. 60. This statute was held unconstitutional on October 1, 1948 in Perez v. Lippold, 32 Cal. 2d 711, 198 P.2d 17.

sailor and, while Langford drove to the outskirts of town, prostituted herself to the sailor. The sailor paid Langford and they returned to the nightclub approximately twenty minutes after they had left it. Bryant's testimony conflicted at this point with that of Jones. He said that he sang only for a short time—five minutes at the most—and that Langford and Jones were in the nightclub when he left their table and were there when he came back after singing. He did not think that they had left the nightclub.

Langford then drove the party to San Diego where they spent the night in a hotel. Early on the morning of the 6th of April, they drove back to Tiajuana, where Jones and Langford signed "marriage papers". Although the certificate of marriage was not received until some days later through the mail Jones considered herself married to Langford from this time forward.

Langford then drove Jones and Bryant back to Los Angeles. Both Jones and Bryant testified that the purpose of the trip from Tiajuana to Los Angeles was to get home, to get to the place they lived. They went directly to Langford's house where Jones found another girl living whom she "kicked out". That night they went to the night club at which they had met. Jones said that Langford asked her if she wanted to take up her profession again that night but she declined in view of the fact that it was her wedding night. Bryant did not hear this conversation. Jones resumed her work the following night, April 7, and continued to prostitute herself for Langford for several weeks. Langford brought customers to her after the marriage as he had before, but not many since by this time she was well established. After some time Jones left Langford again because she got "tired of working all day and all night, there is no appreciation, nothing is ever bought for you, they gripe about it when you want a new pair of shoes". In May she went to work as a prostitute for the proprietor of a Los Angeles "callhouse".

In the Mortensen case, supra, a man and wife, proprietors of a house of ill fame in Nebraska, allowed two of their prostitutes to accompany them on a vacation trip to Salt Lake City, Utah. It was charged that they had violated the Mann Act because they had brought the girls back from Salt Lake City to Nebraska and the girls had resumed their occupation upon their return. The Supreme Court through Mr. Justice Murphy, held [2] that the language of the Mann Act "is conditioned upon the use of interstate transportation for the purpose of, or as a means of effecting or facilitating, the commission of the illegal acts. Here the interstate round trip had no such purpose and was in no way related to the subsequent immoralities in Grand Island."

The rule is conceded that the dominant motive for the interstate transportation of the victim must be the purpose proscribed by the statute,[3] but we think the jury was justified in finding that this case fell within the rule. In its argument to the jury, the government advanced two theories: (1) that Langford had married Jones primarily for the purpose of causing her to return to him and continue to work for him as a prostitute; and (2) that the dominant purpose of Langford in bringing Jones back from Tiajuana to Los Angeles was to get her back to work immediately earning money for him. In the Mortensen case, there was no evidence justifying the inference that, had the Mortensens not taken the girls on the interstate vacation trip, the girls would have refused to perform the proscribed activities for the Mortensens. Here, however, the fact that Langford had used force and threats to keep Jones with him, that she had nevertheless left him again, and that he had put her back to work just a day after the "marriage", warrant the conclusion that the interstate journey and marriage were

---

2. 322 U.S. 369, 377, 64 S.Ct. 1037, 1042, 88 L.Ed. 1331.

3. Hansen v. Haff, 291 U.S. 559, 54 S.Ct. 494, 78 L.Ed. 968; Mortensen v. United States, supra.

nothing but a device to, in the words of the statute, "induce, entice, or compel her to give herself up to the practice of prostitution". The facts here are such that the jury might well disbelieve that the reason for the marriage was the usual one.

■ The other cases upon which appellant relies are readily distinguishable for the same reason. In Van Pelt v. United States, 4 Cir., 240 F. 346, the object of the interstate transportation was to take defendant's mistress from Virginia to Maryland to stay in the latter state until their child was born. The trip was held to have played no part in inducing the commission of a sexual act in Maryland. In Fisher v. United States, 4 Cir., 266 F. 667, 670, the purpose of the trip was to visit the girl's mother. Although illicit relations were resumed on the return, the court held that " * * * the mere fact that a journey from one state to another is followed by such intercourse, when the journey was not for that purpose, but wholly for other reasons, to which intercourse was not related cannot be regarded as a violation of the statute." Here, in view of the unusual attitude of the appellant towards marriage, we think the jury were warranted in finding that so far as appellant was concerned his dominant motive for the marriage was to get control of Jones and re-establish a relationship of pander and prostitute from which he profited so extensively, and that the trip, marriage and all, had that primary end in view.

■ Appellant argues that the verdict of "not guilty" on Count One compels a similar verdict on Count Two. This contention bears a close relationship to his argument that it was improper for the government to indict him on two counts because the trip should be considered as a whole. This latter argument is based upon language found in the Mortensen case, supra, where it was said that the resumption by the girls of their immoral practices after their return from their vacation trip did not justify "an arbitrary splitting of the round trip into two parts so as to permit an inference that the purpose of the drive to Salt Lake City was innocent while the purpose of the homeward journey to Grand Island was criminal". But in that case the outward journey was innocent for it was admitted that no immoral acts had been committed during the trip. Here, as we have seen, it was the government's position that the whole enterprise, the trip to Mexico, the marriage, and the return, were undertaken to get Jones back to work as a prostitute. If the testimony of Jones herself is credited, the consummation of this objective was begun while they were in Mexico, in the incident in Langford's car. The contradiction of this incident in Bryant's testimony may explain the jury's verdict. We do not think the acquittal on the first count is inconsistent with conviction on the second count, but even if it were, consistency in the verdict is not required. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Catrino v. United States, 9 Cir., 1949, 176 F.2d 884.

■ Appellant also argues that the verdict is not supported by the evidence because there is no evidence of intent, and because only the evidence of a self-confessed prostitute connects Langford with the acts of prostitution. While it is true that both Jones and Bryant testified that *their* purpose in making the trip to Mexico was to arrange for the marriage, and *their* purpose in returning was to get home, this has little bearing on Langford's purpose and intent. It is elementary that the intent, motive or purpose necessary for the establishment of a crime may rest in inference.[4] And as we have stated, we think there was ample evidence from which the jury could infer that Langford transported Jones with the intent to induce her to return to her life of prostitution. As to Langford's connection with Jones' immoral acts, the trial judge cautioned the jury that Jones' testimony was to be received with caution. So instructed, the jury were entitled to believe it.

4. See United States v. Reginelli, 3 Cir., 133 F.2d 595, for a case so holding under this statute.

It is next urged that the court erred in admitting Jones' testimony that she saw a prostitute give money to Langford. It is said that this was irrelevant and prejudicial. We disagree. "The intent and disposition with which one does a particular act must be ascertained from his acts and declarations before and at the time; and when a previous act indicates an existing purpose, which from known rules of human conduct may fairly be presumed to continue and control the defendant in the doing of the act in question, it is admissible in evidence." Hall v. United States, 9 Cir., 235 F. 869, 870. The jury were told its purpose at the time it was admitted. Defendant made no request for further instruction with respect to it.

It is next urged that the judgment must in any event be reversed and a new trial ordered because of a violation by government counsel of the rule prohibiting comment upon the defendant's failure to testify. Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650; 18 U.S.C.A. 3481.[5]

In his argument to the jury, government counsel stated, "I think it is significant that the defendant did not go on the stand and the defendant has no witness to impeach the stories of Miss Jones and Mr. Bryant". This went unobserved by both defendant's counsel and the court. Later the assistant United States attorney said: "Once again I want to direct your attention to the fact that the defendant was not on the stand. It seems to me that the least he could do would be to get on the stand and testify as to his occupation at this time

or at the time when these acts were charged last spring, the dates of the acts charged. As a matter of fact, he could not testify to his occupation for he has not had an occupation * * *" At this point the court interposed, "Just a moment. There is no evidence in the record to that effect, counsel. The jury are instructed to disregard counsel's remark." Counsel for the defendant still made no objection to the objectionable remark, and, indeed, they raise the point for the first time on this appeal. It is now pointed out that the trial judge gave as his reason for his admonition, not the impropriety of such comment on the failure to testify, but that counsel was arguing upon matters not in evidence.

On behalf of the government it is said: (1) that the remarks cannot have been prejudicial to defendant in view of the exceptionally strong evidence against him; (2) that any possibility of prejudice was cured by an instruction given by the court on the effect of defendant's failure to testify, and (3) that the objection cannot be considered because not raised at the time of the trial.

Considering these points in inverse order, it appears that this court, and others, have said that an accused waives his right to assert such an error on appeal by failure to object at the time the improper remarks are made. York v. United States, 9 Cir., 241 F. 656; Nobile v. United States, 3 Cir., 284 F. 253; Rice v. United States, 2 Cir., 35 F.2d 689; Milton v. United States, 71 App.D.C. 394, 110 F.2d 556.[6]

5. Tit. 18, § 3481: "Competency of accused. In trial of all persons charged with the commission of offenses against the United States and in all proceedings in courts martial and courts of inquiry in any State, District, Possession or Territory, the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him."
"To prevent such presumption being created, comment, especially hostile comment, upon such failure, must necessarily be excluded from the jury. The minds of the jurors can only remain unaffected from this circumstance by excluding all

reference to it." Wilson v. U. S., 149 U.S. 60, 65, 13 S.Ct. 765, 766, 37 L.Ed. 650.

6. The authority of these cases is somewhat dimmed by the fact that in Johnson v. United States, 318 U.S. 189, 63 S.Ct. 549, 555, 87 L.Ed. 704, after holding that a similar objection had been expressly waived by counsel, the court was careful to note that "we are not dealing here with inadvertence or oversight." The court said: "In such a situation the rule stated by Mr. Justice Sutherland in United States v. Manton, 107 F.2d 834, 848, is applicable: 'If the failure to enter an

Whether it should be held that counsel for accused waived the point by failure to object,[7] or whether the right of a defendant is so important that such comment should be treated as a "grave error", not waived by a mere inadvertent failure to object, and subject to notice on appeal as a "plain error"[8] depends upon the gravity of the error in the particular case, —upon how flagrantly the rights of the accused have been disregarded. Because of our view of the circumstances attending the making of the particular comments here involved, which we shall presently mention, we see no reason why we should treat as plain error that which counsel themselves did not notice sufficiently to call to the court's attention at the time.

Had the trial court either admonished the jury to disregard the remarks of counsel,[9] or given a general instruction to the effect that the jury must give no weight to defendant's failure to testify,[10] the error would have been cured. The court did instruct the jury as follows: "The defendant has not offered himself as a witness. In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, upon the government to prove every essential element of the charge against him. And no lack of testimony on the defendant's part will supply a failure of proof by the government so as to support by itself a finding against him on any essential element of the offense."

Unlike the instruction which was held to have been properly requested in Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257, this one neglected to state, in so many words, that the failure of the defendant to take the stand does not create any presumption against him, or that it should not enter into the discussions or deliberations of the jury. The general import of the instruction given was that defendant's failure to testify cannot supply anything lacking in the government's case. There remains the possibility that the jury, in obedience to the instruction, might require the government to furnish proof of every essential fact, and still consider that the failure of defendant to testify added weight to such proof.[11]

exception or assign error had been a mere inadvertence the matter might stand in a different light. But that view cannot be indulged. Plainly enough, counsel consciously and intentionally failed to save the point and led the trial judge to understand that counsel was satisfied.' "

7. The rule commonly applied in cases of alleged prejudicial argument, not involving comment on defendant's failure to testify, is stated in Cain v. United States, 8 Cir., 19 F.2d 472, 475, as follows: "No objection was made to it, and the trial court was not given a chance to cure it by rebuke or otherwise, which it might well have done, if it was hurtful, and if such action had been requested. Any act of the court itself may be preserved by a mere exception, but inimical acts of adverse counsel, witnesses, and others must be called to the attention of the trial court by an objection (grave errors, of course excepted, which this court may notice sua sponte), followed by an exception to the ruling of the court, if he fail by his ruling to afford adequate correction of the matter to which objection is made."

8. The right to have the prosecutor refrain from such a comment is not a "fundamental right" protected by the Fourteenth Amendment. Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223. The Supreme Court has carefully refrained from holding that the prohibition against such comments is a necessary compulsion of the Fifth Amendment. See Adamson v. California, supra, 332 U.S. 46, at page 50, 67 S.Ct. 1672; Twining v. New Jersey, 211 U.S. 78, 114, 29 S.Ct. 14, 53 L.Ed. 97.

9. As in Brooks v. United States, 9 Cir., 8 F.2d 593; Robilio v. United States, 6 Cir., 291 F. 975, certiorari denied 263 U. S. 716, 44 S.Ct. 137, 68 L.Ed. 522, and Morgan v. United States, 7 Cir., 31 F. 2d 385. Cf. Wilson v. United States, supra.

10. As in United States v. Di Carlo, 2 Cir., 64 F.2d 15, and Milton v. United States, 71 App.D.C. 394, 110 F.2d 556.

11. The record shows that the court took this instruction from "California Jury Instructions Criminal", (West Publishing Co. 1946) a compilation of instructions for use in the California courts. It would therefore be expected to be so framed as to be consistent with the right

Had defendant saved the point by proper objection, the instructions given would not have cured the error. But again, when given an opportunity to make their objections to the charge as given, before the jury retired, counsel for defendant stated none.[12]

We believe that the remarks of the prosecutor, when considered as the jury must have viewed and understood them in the light of what transpired at the time, were not prejudicial. We have come to this conclusion, not for the reason urged by the government, but for the reason that we do not think that the remarks of counsel were made in such manner as would be likely to lead the jury to draw improper inferences.

The statement first made was: "I think it is significant that the defendant did not go on the stand and the defendant has no witness to impeach the stories of Miss Jones and Mr. Bryant". The comment which is prohibited is one which is likely to suggest that the jury should draw adverse inferences from the accused's failure to testify. The substance of the remark here made was that the testimony of Miss Jones and Mr. Bryant was not contradicted. It is true that the prosecutor prefaced this by referring to the fact that the defendant did not go on the stand, a fact which the jury of course knew. But we do not think that the statement, considered in its entirety, would increase the likelihood that the jury would draw adverse inferences from defendant's failure to testify. And, except in those special cases where it appears that the accused himself is the only one who could possibly contradict the government's testimony, Linden v. U. S., 3 Cir., 296 F. 104, the prosecutor may properly call attention to the fact that the testimony of the government witnesses has not been contradicted. Baker v. United States, 8 Cir., 115 F.2d 533, certiorari denied 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128.

When the later reference was made to defendant's failure to testify, the court stopped counsel, and instructed the jury to disregard the remarks. As we now read the record we can note that the reason which the court then stated for his admonition was that the argument was unsupported by evidence in the record. But looking past this cold record, and considering the matter as it must have appeared to the jury, we believe that the net effect upon them undoubtedly was a simple understanding that they were to disregard what the prosecutor was saying.

To the minds of the jury the effect must have been the same as if the court had given a correct reason for its ruling, namely, that the remarks of the counsel were improper. The silence of counsel for defendant and their failure to object suggest that they had the same impression.

We think that to treat what was said here as such a violation of the rule concerning comment on defendant's failure to testify as to be seriously prejudicial to defendant would be wholly unrealistic.[13] We think that under such circumstances any error in this respect could be, and was, waived by the failure of defendant's counsel to object.

Appellant's last assignment of error has little merit. In his argument to the jury, the prosecutor said, "If he is permitted to go free eventually he is going to be brought into a courtroom again possibly—it is possible—and charged with the same offense." Thereupon the trial judge interposed: "I do not think counsel can speculate as to the future conduct of the defendant. The jury has to determine

---

of the prosecutor to comment on defendant's failure to testify, a right which he has in California. Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L. Ed. 1903, 171 A.L.R. 1223.

12. See Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A.

13. "Abstract inerrancy is hardly possible in the trial of a case in a federal court;

it is never an essential to a valid trial there. * * * Too much is said and done about too little in the heat and hurry of a trial, for it all to be important. Things of no moment in their transpiring are not made momentous merely by making record of them." Maryland Casualty Co. v. Reid, 5 Cir., 76 F.2d 30, at page 33.

whether he is guilty as charged in this indictment for his past conduct." It is urged that the judge's failure to expressly tell the jury to disregard those speculative remarks constituted prejudicial error. We disagree. The positive statement that the jury was only to consider his past conduct was at least as helpful to the jury as informing them they should not speculate as to the accused's possible future conduct.

Since we find no error in the record, the judgment is affirmed.

Upon Petition for Rehearing

PER CURIAM.

Upon petition for rehearing it is urged that our decision runs counter to Oriolo v. United States, 324 U.S. 824, 65 S.Ct. 683, 89 L.Ed. 1393. There, by memorandum opinion, the Court reversed United States v. Oriolo, 3 Cir., 146 F.2d 152, on the authority of Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331.

As pointed out by Judge Biggs, dissenting from the opinion of the Court of Appeals, the parties there simply took a day's outing at Atlantic City, New Jersey, all the time intending to resume the prostitution at Philadelphia. It was thought by Judge Biggs that the fact that defendant lost his car at Atlantic City, and that as they left New Jersey on the return trip by train he remarked to the woman that she must earn money for him so he could recover his car did not demonstrate a sufficient change of purpose to distinguish the case from the Mortensen case. He thought the difference between transportation to earn money for defendant to recover his car and transportation to earn money for him, was too trivial to be significant. Evidently the Supreme Court agreed.

What we have previously said with respect to the whole purpose of the trip to Mexico and return sufficiently discloses that our decision did not proceed upon the theory of any change of purpose. For that reason we think the decision in the Oriolo case, supra, is inapplicable here.

The petition for rehearing is denied.