Russell L. STERLING and William M. Fairbanks, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18850.

United States Court of Appeals Ninth Circuit.

June 12, 1964.

Rehearing Denied July 20, 1964.

John F. Dore, Seattle, Wash., for appellants.

Brockman Adams, U. S. Atty., and Robert C. Williams, Asst. U. S. Atty., Seattle, Wash., for appellee.

Before CHAMBERS, Chief Judge, and HAMLEY and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Appellants Sterling and Fairbanks were each convicted by a jury in the United States District Court for the Western District of Washington of (1) having stolen six cases of Black & White Scotch Whisky from a shipment in foreign commerce and (2) having these six cases in their possession knowing them to have been stolen, all in violation of 18 U.S.C. § 659 (1958). Jurisdiction of this court is based on 28 U.S.C. § 1291 (1958). Appellants complain that: (1) The indictment was not a sufficiently definite

statement of the essential facts of the offenses charged; (2) the evidence is insufficient to support a conviction; (3) comment of the prosecutor on defendants' failure to put in evidence amounted to prejudicial misconduct; and (4) certain instructions to the jury were erroneous.

The indictment in the case reads as follows:

## COUNT I

On or about October 17, 1962 at Seattle, Washington, within the Northern Division of the Western District of Washington, Russell L. Sterling and William M. Fairbanks and each of them did knowingly, wilfully and unlawfully steal, take, and carry away from a platform, depot and wharf at Pier 20 in Seattle with the intent to convert to their own use certain goods and chattels of a value exceeding $100.-00, to wit, six cases of Black & White Scotch Whiskey, which were moving as and were a part of a foreign shipment of freight.

All in violation of 18 U.S.C. 659 and 18 U.S.C. 2(a) and 2(b).

## COUNT II

On or about October 17, 1962, at Seattle, Washington, within the Northern Division of the Western District of Washington, Russell L. Sterling and William M. Fairbanks and each of them did knowingly, wilfully and unlawfully have in their possession certain goods and chattels, to wit, six cases of Black & White Scotch Whiskey of a value exceeding $100.00, which had been stolen from a platform depot and wharf at Pier 20 in Seattle, and which goods and chattels were moving as and were a part of a foreign shipment of freight, with intent to convert said goods and chattels to their own use and knowing the same to have been stolen.

All in violation of 18 U.S.C. 659 and 18 U.S.C. 2(a) and 2(b).

The standard which an indictment must meet is set forth in Hagner v. United

States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932).

"The rigor of old common law rules of criminal pleading has yielded, in modern practice to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the *record* shows with accuracy to what extent he may plead a former acquittal or conviction.' " (Emphasis added.)

Appellants complain that the above indictment does not meet this standard because (a) it does not contain allegations of ownership of the merchandise and (b) it does not sufficiently identify the place from which it was allegedly taken.

As to lack of allegations of ownership appellants rely upon United States v. McCulloch, 6 F.R.D. 559, 560 (N.D. Ind. 1947). The allegations of the indictment in that case were far more meager than those in the instant case. There the district court held that the indictment was invalid because (1) it did not charge that the goods were obtained from any of the places or facilities of transportation enumerated in the statute, and (2) it did not identify the stolen goods with sufficient definiteness. After making this holding the court then made this statement: "Allegations of ownership or other averments tantamount to identify by ownership are essential." In Goldstein v. United States, 73 F.2d 804 (9th Cir. 1934), this court had occasion to consider the sufficiency of an indictment under this same statute. The indictment in that case contained no alle-

gations of ownership and was upheld by this court as sufficient.

In United States v. Linderman, 20 F.R.D. 459, 461 (D. Mont. 1957), in considering the sufficiency of an indictment under this statute the district judge stated: "It is not necessary to allege ownership where the indictment otherwise identifies the stolen goods with sufficient definiteness." We agree with this statement of the rule.

In the indictment in this case the stolen property was described as six cases of Black & White Scotch Whisky which was stolen from a platform, depot and wharf at Pier 20 in Seattle. In addition to the designation in the indictment of the property there was filed prior to trial a trial memorandum by the government which described in detail exactly where the whisky was stored, what ship it had been unloaded from, the name of the person to whom the whisky was consigned, and then described in detail the activities of appellants Sterling and Fairbanks in removing the whisky from the wharf and placing it upon a truck as these activities were seen by eyewitnesses on the date of the theft.

The purpose of the rule that the properties alleged to have been stolen be sufficiently identified is to provide the defendant with complete information of the crime with which he is being charged so that he may prepare his defense and plead the judgment in bar of a subsequent prosecution. Both of these requirements are amply fulfilled in this case. We therefore hold that there is no merit in appellants' contention of a lack of definiteness in the charge.

We shall next examine appellants' contention that the evidence was insufficient to support a conviction. A statement of the facts shown by the evidence follows.[1] The vessel PACIFIC UNITY arrived in Seattle, Washington, from Glasgow, Scotland, during the early morning hours of October 17, 1962, and moored at Pier 20 in Seattle for the pur-

1. Most of these are included in appellants' "Statement of Facts."

pose of discharging her cargo consisting in part of 1460 cases of Scotch whisky. In the afternoon of that day while the whisky was being unloaded from this vessel, two customs port investigators were working on the Seattle waterfront, spending most of their time in the vicinity of Pier 20. Under normal and customary procedure the liquor would be taken immediately from the vessel to one of the bonded lockers in Warehouse No. 5. The liquor did not belong in the vicinity of door No. 4 of said warehouse. The investigators noticed a pickup truck without a required gate pass parked adjacent to said warehouse and observed that the truck had recently been backed up to door No. 4 under suspicious circumstances. Some investigators took up a position of surveillance outside the warehouse a little over a hundred feet from the truck. Positive identification of Sterling and Fairbanks was made by three customs officers. Sterling and Fairbanks were seen in conversation after which Fairbanks got into the cab of the truck and Sterling opened door No. 4. A pallet board of Black & White whisky was in this doorway. Sterling was seen to "look all around in every direction" and then to start handing cases of whisky down to the platform below the door where Fairbanks picked them up and placed them in the truck. A customs investigator approached from inside the warehouse and asked Sterling (referring to the whisky), "What's this doing in your truck?" Sterling did not answer. On seeing this investigator, Fairbanks quickly jumped into the truck and drove off. He was apprehended by a customs agent at the main gate to Pier 20, approximately one-third of a mile from Warehouse No. 5. Six cases of the Black & White Scotch Whisky were found in the truck. The identifying marks on these cases matched those of the shipment from Glasgow, Scotland, to Seattle, Washington, on board the vessel PACIFIC UNITY.

Appellants contend that the evidence does not show a "taking" or a "carrying away" of the whisky because when the truck was stopped at the gate it was still in Pier 20. There is no merit to this contention. As the indictment charged and as the evidence showed, the whisky was taken from a platform, depot and wharf at Pier 20 and carried away more than one-third of a mile.

◼ Appellant Sterling contends that Count II should have been dismissed as to him because he did not have actual or constructive possession of the six cases of whisky. This also is without merit. The evidence clearly shows that Sterling and Fairbanks were acting together. The "possession" alleged in Count II is a separate offense. Carroll v. United States, 174 F.2d 412 (6th Cir.), cert. denied, 338 U.S. 874, 70 S.Ct. 136, 94 L. Ed. 536 (1949). Sterling aided and abetted Fairbanks in the possession of the whisky and thus is guilty of the charge in Count II, Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L. Ed. 919 (1949), even if it could be successfully contended (which we do not admit) that the constructive possession by Sterling had not been shown.

◼ Another contention of appellants is that the six cases of whisky, when allegedly taken by the defendants, were not in foreign commerce for the reason that the cargo of whisky from Scotland had reached its destination in Seattle, in the United States, had been unloaded, and the carrier, Furness Lines, had surrendered control of the cargo to the agent of the consignee, the Washington State Liquor Control Board, and further that the evaluation as made indicated that ownership and control had passed to the consignee. We cannot agree. The evidence showed that the first sixty cases of the shipment of Scotch whisky were not released from customs until October 22, 1962, some five days after the offenses charged in this indictment. On October 17, 1962, the six stolen cases "were a part of a foreign shipment of freight."

Appellants' next contention is that the prosecutor, during his arguments, was guilty of prejudicial misconduct which deprived them of a fair trial. The record

shows that during the opening argument by government attorney Williams the proceedings set forth in the margin occurred.[2]

No further reference to this matter was made by government counsel in the remainder of his opening argument or in his closing argument. However, defense counsel in his argument to the jury made reference to the fact that defendants did not testify, which references are set out in the margin.[3]

2. "MR. WILLIAMS: Now we come to another element, an important element in proving every crime, that is criminal intent.

"Now, you will notice that the Indictment charges that these acts were done knowingly, willfully and unlawfully. Now, the Court will instruct you, I believe, that it is impossible to get inside somebody's head and prove what was going on at a particular time inside his head. We have to prove intent in every case by circumstantial evidence, because there is no other way to prove it.

"Now, in this case no evidence was offered by the defense to controvert the obvious circumstantial evidence of intent.

"MR. DORE: I will object to that, your Honor, and move for a mistrial. The inference is that the defendants did not testify.

"THE COURT: The objection is overruled and motion denied.

"MR. WILLIAMS: There was no evidence offered by the defense to show that this was their whiskey. There was no evidence offered by the defense to show that this was a mistake. Now, you remember the—

"MR. DORE: I renew my motion, your Honor, for a mistrial at this time. Counsel seems to persist in this.

"THE COURT: Members of the jury, you may retire."

During the recess argument was presented by counsel and then the following proceedings occurred:

"THE COURT: Here are the three arguments that were made by Mr. Williams. He said first, 'No evidence was offered by the defense,' now he didn't say 'defendants', he said, 'the defense to controvert the obvious circumstantial evidence of intent.'

"Then after I denied your motion, Mr. Dore, with respect to that comment he went on further to say, 'There was no evidence offered by the defense,' again not 'the defendants', 'the defense to show that this was their whiskey,' and he made the further statement, 'There was no evidence offered by the defense to show that this was a mistake.' He did not use the word 'defendants' at any time.

"Now, I have done some research myself during this recess and I feel very strongly that this approaches close to the forbidden zone, but I do not think it constitutes prejudicial error.

"As I said, the reference was made to the defense. That reference could have been to you, Mr. Dore, and not the defendants. Of course, it was possible for the defense to offer witnesses other than the defendants to controvert the goverment's evidence commented upon.

"I am going to deny your motion, but I will say this to you, Mr. Williams, that I think that if you continue to repeat things of this kind, that the continued repetition of it, the cumulative effect of it, may cause me to change my mind.

"MR. WILLIAMS: Your Honor, I haven't had a chance to go over the instructions with a fine tooth comb but I think it is appropriate at this time to request that if the Court doesn't already plan to, to give an instruction which is clear and explicit to the effect that the defendants are not required to take the stand.

"THE COURT: I shall give such an instruction. If the defendants want me to instruct the jury to particularly disregard these comments, I may give consideration to it. It might be worse than if I say nothing.

"MR. DORE: That may be true, your Honor. That is what I am afraid of.

"THE COURT: Bring in the jury. I feel to this point, Mr. Williams' comments, while borderline, are within what is permissible, but I do not want them repeated so they will have cumulative effect."

3. "MR. DORE: Your Honor, Mr. Williams, ladies and gentlemen of the jury. In this case the Court will instruct you that you are not to consider at any time the fact that either of the defendants have not chosen to call themselves as witnesses in this case.

"Now, that is my responsibility. I am the attorney for these two men. I have advised them that there is no necessity as the charges have been set forth here in my legal defense of this case for them to explain anything, and any explanation, they are under no obligation to explain their acts, but the government here is

During the court's instructions the jury was instructed as follows:

"The law does not compel any defendant to take the witness stand and testify, and no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of a defendant in this case to testify." [4]

In Langford v. United States, 178 F.2d 48, 53 (9th Cir. 1949), cert. denied, 339 U.S. 938, 70 S.Ct. 669, 94 L.Ed. 1355 (1950), this court had occasion to consider a somewhat similar problem. In that case government counsel in his argument at one time stated, "I think it is significant that the defendant did not go on the stand and that defendant has no witness to impeach the stories of Miss Jones and Mr. Bryant." At another point the government counsel stated, "Once again I want to direct your attention to the fact that the defendant was not on the stand. It seems to me that the least he could do would be to get on the stand and testify as to his occupation at this time, or at the time when these acts were charged last spring * * *." The court in discussing this stated:

"The comment which is prohibited is one which is likely to suggest that the jury should draw adverse inferences from the accused's failure to testify. The substance of the remark here made was that the testimony of Miss Jones and Mr. Bryant was not contradicted. It is true that the prosecutor prefaced this by referring to the fact that the defendant did not go on the stand, a fact which the jury of course knew. But we do not think that that statement, considered in its entirety, would increase the liklihood [sic] that the jury would draw adverse inferences from defendant's failure to testify. And, except in those special cases where it appears that the accused himself is the only one who could possibly contradict the government's testimony, Linden v. U. S., 3 Cir., 296 F. 104, the prosecutor may properly call attention to the fact that the testimony of the government witnesses has not been contradicted. Baker v. United States, 8 Cir., 115 F.2d 533, certiorari denied 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128. * * *" 178 F.2d at 55.

In the Langford case there was no objection made by the defendant to the

---

under a burden to prove beyond all reasonable doubt, that is all doubt for which you have a valid reason, that these two men committed these crimes as charged beyond all reasonable doubt, and I submit there are numerous reasons why you can very well and should have a doubt in regard to these two charges as specified against these two men."

*       *       *       *       *

"And you shall not in your deliberations or in your minds subconsciously discuss or hold against these men in any way the fact that they exercised their American right upon my advice not to testify. If anyone is to be blamed for that, that is me. Don't blame these men, because as I say, in my opinion there was nothing that they could explain for the reason that by their plea of not guilty to this paper indictment they have denied the charges against them."

4. The following three instructions were requested by appellants, but were not given by the court:

"5. A defendant in a criminal case may, at his own request but not otherwise, be a competent witness. Under the statute it is a matter of choice whether he becomes a witness or not and his failure to accept the privilege shall not create any presumption against him.

"6. The failure of any defendant to take the witness stand and testify in his own defense does not create any presumption against him. The jury is charged that it must not permit that fact to weigh in the slightest degree against any such defendant, nor should this fact enter into the discussions or deliberations of the jury in any manner.

"7. The defendant in a criminal case is under no requirement to explain away the charge against him. He may refuse to testify and he may fail to call witnesses or produce evidence in his behalf, and yet be entitled to have the jury pass upon the question of his guilt."

prosecutor's statement. The court said in Langford:

"Had the trial court either admonished the jury to disregard the remarks of counsel, or given a general instruction to the effect that the jury must give no weight to the defendant's failure to testify, the error would have been cured." Id. at 54.

No such instruction was given in the Langford case. In the instant case the court did give the instruction set out above.

The government points out that in the instant case appellants were not the only persons who could have been produced to establish their lack of criminal intent. Appellees argue that the defense could have introduced evidence from witnesses, excluding the defendants, to the effect that: (1) Gate passes are not generally required for certain vehicles at Pier 20; (2) orders had been given to place the pallet board by door No. 4; (3) there was no custom to immediately take the liquor to bonded lockers; (4) someone else had given instructions to move the whisky to the front gate; (5) a permit or delivery order for the whisky had been issued to the defendants on October 17; (6) a trucking company retained by the consignee had employed them; (7) motor vehicles did not need gate passes; (8) they were not longshoremen or had only been longshoremen for a short period of time; or (9) another lot of Black & White Scotch Whisky was at Pier 20 on the day in question.

There appears to be much merit in the illustrations given by appellee. Other cases have also considered whether the defendant was the only person who could possibly contradict the government's evidence. In United States v. Borda, 285 F.2d 405, 408 (4th Cir.), cert. denied, 365 U.S. 844, 81 S.Ct. 804, 5 L.Ed.2d 810 (1961), the court said:

"If the defendant did not go to Dever's hotel room and engage in a conversation with him, it is not un-

likely that he could have produced witnesses to his presence elsewhere at the time Dever said he was in Dever's room."

In Hunt v. United States, 231 F.2d 784, 785 (8th Cir. 1956), cert. denied. sub nom. Hickman v. United States, 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d 78 (1957), the court stated:

"[B]ut if Hunt had, in fact, worked as a mechanic upon the automobile, evidence other than his own would, no doubt, have been available and would or could have been produced by other witnesses."

In United States v. Wright, 309 F.2d 735, 738–39 & n.1 (7th Cir. 1962), the statement made by government counsel was:

"You heard the evidence from the witness stand under oath, and as to Defendant William Wright it is unrefuted and undenied. Out of one hundred and seventy million people in the United States not one witness took the stand to refute the Government's case. Not from New York or anywhere they would come."

The court in the Wright case stated:

"The Supreme Court has held that the Fifth Amendment and 18 U.S.C. § 3481 preclude any comment or argument about a defendant's failure to take the stand in a criminal trial [citing Stewart v. United States, supra]. This rule, however, must be interpreted in the light of reason and it must appear that 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955). We are in accord with what was said in Langford v. United States [regarding whether the defendant himself is the only one who could possibly contradict the government's testimony] * * *. In any event, we feel

that one of the court's instructions[5] was sufficient to correct any misinterpretation that may have resulted from the comments of government counsel. It is pertinent here to recall what Judge Augustus Hand said in United States v. DiCarlo, 64 F.2d 15, 18 (2nd Cir. 1933): 'We should be blind to realities if we supposed that juries are unconscious of the omission of a defendant to take the stand, and we think the express intruction to the jury in this case, that this fact must not prejudice the defendant, did all that could ever be done to prevent the consideration by them of the omission in arriving at their verdict.' "

In the instant case, not only did the instructions of the court make it plain that no presumption of guilt could be raised by the failure of appellants to take the stand, but this on two occasions was definitely argued to the jury by appellants' counsel in his argument.

■ We do not look with complete approval upon the statements made by the prosecutor in this case, nor is it a model of what a prosecutor's conduct should be in this regard. However, we must look at the statements in the context of the situation as it existed. We are mindful of the comment made by this court in the Langford case:

"We believe that the remarks of the prosecutor, when considered as the jury must have viewed and understood them in the light of what transpired at the time, were not prejudicial * * * for the reason that we do not think that the remarks of counsel were made in such a manner as would be likely to lead the jury to draw improper inferences." 178 F.2d at 55.

After a consideration of the entire matter, including the proper instruction given by the court, the overwhelming evidence of the case, and all of the other factors involved, we hold that there was no showing of prejudice to the appellants. The record contains no basis for a reversal.

Judgment affirmed.

---

5. "The fact that a defendant did not testify in his own behalf in this case does not create any presumption against him, and the jury must not permit that fact to have the slightest influence in arriving at a verdict." [Renumbered from court's footnote 2.]